330 A.2d 66.

STATE *vs.* LOYAN DAN SCOTT, JR. *et al.*

DECEMBER 31, 1974.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

DORIS, J. These are two indictments, one No. 70-1198 charging the defendant Loyan Dan Scott, Jr. with the murder of Dennis Joseph Mulhern, and the other No. 70-1199 charging the defendant with the kidnapping of Mulhern. On a motion by the state, the indictments were consolidated for trial with two other indictments, No. 70-1139 charging one John Domenick Euart with the murder of Mulhern and No. 70-1140 charging Euart with the kidnapping of Mulhern. The defendant, Scott, filed a motion for severance which was denied. After a trial before a Superior Court justice and a jury, Scott and Euart were each convicted of manslaughter and kidnapping, and following a denial of their motions for a new trial both were sentenced to the Adult Correctional Institutions. The defendant, Scott, seasonably filed his appeals which are now before this court.

The record discloses that on July 6, 1970, defendant and two companions, Donald J. Picard and Elbert B. Bowden, Jr., members of "Hell's Angels," a national motorcycle club, arrived in Bristol from Lowell, Massachusetts, in a red Ford to talk to the victim, Dennis J. Mulhern, concerning his claim that he was a member of the Hell's Angels. At about the same time Euart, Richard J. Harris, and William Moss, members of a Providence motorcycle club called the "East Coast Motorcycle Federation" sometimes referred to as "E.C.M.F.", arrived in Bristol in a blue Cadillac convertible. Three other members of the Providence club had earlier arrived in Bristol. They were Richard Rose and Lawrence Moosey, who arrived on a motorcycle driven by Rose, and Andrew Bergeron, who arrived on another motorcycle. The latter three entered

an establishment called Bond's Restaurant and after mak-
ing inquiries as to the whereabouts of Mulhern, left the
restaurant. Bergeron, on his motorcycle, drove to the
apartment where Mulhern was staying and then drove
Mulhern to Denny's Tap where they met Rose and
Moosey. Mulhern was offered a drink of beer, and shortly
thereafter the group left the Tap and crossed the street
to a parking lot where the red Ford and the blue Cadillac
convertible, with the top down, were parked. The occu-
pants of the Ford and the Cadillac left their cars and were
joined by the men who had left the bar.

The members of the Hell's Angels, Scott, Picard, and
Bowden, then questioned Mulhern to determine whether
or not he was a member of the California chapter of the
Hell's Angels. After a short time, Picard, Euart and
Moosey left the parking lot and entered Denny's Tap
to make a phone call in an attempt to learn whether
Mulhern was in fact a member of Hell's Angels. When
Picard returned to the parking lot, he told Mulhern that
he did not believe he was a member of Hell's Angels. He
then punched Mulhern, knocking him to the ground.
Thereupon the Hell's Angels members began to kick and
continued to kick Mulhern when he was on the ground.
After asking for and receiving permission to "get a piece
of the action", the E.C.M.F. members joined in the beat-
ing.

After a short time Harris and Moss picked up the bleed-
ing Mulhern from the ground and placed him in the back
of the Cadillac, which then left the parking lot and drove
off toward Providence, with Moss, Harris, Euart, and the
victim Mulhern inside. The Ford, carrying Picard, Bow-
den and defendant Scott, also left the parking lot and
following the Cadillac, headed toward Providence. Richard
Rose, driving his motorcycle on which Moosey was a pas-
senger, followed the cars toward Providence. Bergeron,

on his motorcycle, was riding side-by-side with Rose. Richard Rose testified that he observed Moss, Euart, and Harris, the persons in the Cadillac, making punching motions toward the location where Mulhern was sitting, but that he was not able to see where the blows landed. There was also testimony that one of the E.C.M.F. members was shouting "keep quiet" or words to that effect.

At a point on the Wampanoag Trail, the highway to Providence, the cars and motorcycles stopped, and Rose and Bergeron were directed to return to Bristol to look for a knife and other articles that may have fallen from the pockets of one of the members. Rose and Bergeron did in fact return to Bristol, and thereafter they drove to the E.C.M.F. clubhouse in Providence. Rose testified that when he arrived at the Providence clubhouse he did not see the victim Mulhern there, nor did he see Scott or Euart. The body of the victim, Mulhern, was found floating in the Providence River by members of the East Providence Police Department some four days later.

## I

### Severance

The defendant first contends that the trial justice's denial of his motions for severance constituted prejudicial error. He concedes that the law is clear in this state that severance is not a matter of right but is within the sound discretion of the trial justice, and that denial of such a motion is not sufficient reason for ordering a new trial absent a showing of prejudice. *State* v. *Mastracchio,* 112 R. I. 487, 312 A.2d 190 (1973); *State* v. *Kieon,* 89 R. I. 320, 152 A.2d 531 (1959).

In *State* v. *Patriarca,* 112 R. I. 14, 308 A.2d 300 (1973), we said that a denial of a motion to sever is not grounds for reversal, unless it is affirmatively shown that defend-

ant did, in fact, suffer prejudice sufficiently substantial to impinge upon his right to a fair trial.

The defendant points to the fact that he was a member of Hell's Angels and that Euart was a member of E.C.M.F., and argues that the absence of direct evidence that the Hell's Angels group returned to the Providence clubhouse of E.C.M.F., would render the evidence presented against him extremely weak if he were tried alone. He also points out that it was conceivable he would not offer any evidence in his defense after the state rested its case, and that Euart might wish to offer testimony which could create prejudice in the minds of the jury toward him.

Here, the trial justice avoided the possibility that evidence against Euart would be considered against Scott by properly instructing the jury that deliberations regarding each defendant were to be carried on separately as to each charge and that evidence against one defendant could not be used to convict the other. These instructions in our judgment prevented any prejudice to defendant Scott. *State* v. *Mastracchio, supra.*

The fact that it was conceivable that Scott would not offer any evidence after the state had rested its case, does not supply the type of prejudice necessary under *State* v. *Patriarca, State* v. *Mastracchio,* and *State* v. *Kieon,* all *supra.* The defendant has failed to affirmatively show prejudice and has not demonstrated that the trial justice abused his discretion in denying his motions for severance.

## II

### Statements By The Prosecutor

The defendant next argues that the trial justice committed prejudicial error in denying his objections to statements made by the prosecutor in final arguments to the jury. The prosecutor said in his closing statement:

"Let me point out that the savage beating that Dennis Mulhern received there in the parking lot in Bristol, Rhode Island, the kicking, the stomping, the punching about the face, and Richard Rose said when he was lifted up he appeared to be — I believe the word was 'dazed'. And who wouldn't be? And as a result of that beating, and another beating, Dennis Mulhern died. And who told us about another beating that took place? Richard Rose did. And what beating did he tell us about? The beating at the East Coast M.F. Club in Providence on Eddy Street, which we saw the exterior of several days ago, and at that point do you recall —."

The defendant contends that the statement was not accurate, and that the trial justice should have cautioned the jury that the statement was inaccurate.

There is no precise formula to delineate the proper bounds of the prosecutor's argument to the jury. *State* v. *Mancini*, 108 R. I. 261, 274 A.2d 742 (1971); *State* v. *Peters*, 82 R. I. 292, 107 A.2d 428 (1954). He is, however, allowed considerable latitude in argument as long as he stays within the evidence and the legitimate inferences to be drawn therefrom. *State* v. *Mancini, supra.* Here the record indicates that Richard Rose testified as to a statement he heard Moss make to Euart regarding an injury to Euart's hand incurred while attempting to hit Mulhern, and that this statement, plus the testimony of FBI Agent, Cornelius G. McWright, that a lab report of an analysis of a piece of wood paneling from the E.C.M.F. clubhouse indicated that the stains found on the paneling were human blood, was enough to warrant a fair implication that a beating took place at the Providence clubhouse.

We therefore conclude that the prosecutor's statement was not improper or prejudicial.

The defendant next argues that the reference by the

prosecutor to Hell's Angels implied guilt by association and was therefore prejudicial. We do not reach that conclusion. As we read the record, we are satisfied that the prosecutor in referring to the Hell's Angels was merely summarizing in a conclusory manner the testimony given by the witnesses, and it cannot be said to be so irrelevant and extraneous as to have inflamed the passions of the jury and prejudiced defendant.

The defendant's allegations that the prosecutor's reference to the character of Euart's wife resulted in prejudice to him is without merit since he has not indicated specifically what the remarks were or wherein they were prejudicial.

## III

### Motion for Judgment of Acquittal

The defendant did not testify or present any evidence in his defense, but rested at the end of the state's case and moved for judgment of acquittal which was denied by the trial justice.

It is a well-settled rule that in considering a defendant's motion for judgment of acquittal, the trial justice must give full credibilty to the state's evidence, view it in the light most favorable to the state, and draw therefrom every reasonable inference consistent with guilt. Neither the credibility of the witnesses nor the weight of the evidence is before the court. *State* v. *Rifkin,* 112 R. I. 308, 309 A.2d 15 (1973); *State* v. *Amado,* 109 R. I. 53, 280 A.2d 324 (1971); *State* v. *Murphy,* 107 R. I. 737, 271 A.2d 310 (1970).

The defendant argues that there was no evidence he punched or kicked the victim during the fracas in the Bristol parking lot, that there was no evidence connecting him with the alleged kidnapping, and that there was no evidence he had participated in any activities involv-

ing the victim at the Providence clubhouse of E.C.M.F. He contends, therefore, that even viewing the evidence adduced by the state and the reasonable inferences to be drawn therefrom in the light most favorable to the state does not establish guilt beyond a reasonable doubt, and the trial justice erred in not granting his motion for judgment of acquittal. *State* v. *Saulnier,* 109 R. I. 11, 280 A.2d 85 (1971); *State* v. *Main,* 94 R. I. 338, 180 A.2d 814 (1962).

The record is clear that Richard Rose named defendant Scott as one of the persons he saw beating the victim at the Bristol parking lot. The testimony indicated that defendant was an active participant in the episode at Bristol which resulted in the victim being placed, while dazed and bleeding, in the Cadillac and driven off with defendant following in the red Ford. The medical examiner, Dr. Palumbo, testified that the cause of death of the victim was pulmonary edema resulting from a severe injury to the brain which was consistent with blunt trauma which could have resulted from a fist striking the victim's head. Doctor Palumbo further testified that after receiving such blows, a person could live anywhere from several minutes, up to 2 or 3 days before expiring. Here, the trial justice followed the rule as delineated in *Riffkin* and *Amado,* and after reciting the evidence, concluded that there was sufficient evidence to go to the jury. We agree.

It is established, therefore, that there existed proper questions for submission to the jury, and we are therefore persuaded that the trial justice did not err in denying defendant's motion for judgment of acquittal.

## IV

## Motion To Pass

The defendant contends that the trial justice committed

error when he denied his motion to pass the case because of alleged prejudicial remarks made by the prosecutor. The defendant alleges that he was deprived of a fair trial when the prosecutor made reference to the fact that Richard Bergeron and Ed Roy were charged with the crime of misprision of a felony.

Although defendant has failed to point out in what manner such comment was prejudicial to him, we assume and will consider the statement to be probably harmful to defendant.

Here, the trial justice followed the rule in *State* v. *Peters, supra,* where we said that if improper or extraneous matter of a harmful nature is intentionally injected or accidentally creeps into the evidence, it is the duty of the trial justice to free the evidence from such matter, if possible, with proper warning to the jury, and if not reasonably possible, to pass the case.

The trial justice instructed the jury as follows:

> "Ladies and Gentlemen, a preliminary instruction, I have stricken from the record a remark, a statement, made by Mr. Thovmasian just prior to the morning recess. Whether or not any charges were brought against individuals not on trial here is in no way relevant to this proceeding, and may in no way be considered by you people as evidence in the case. In any event, the remark has been stricken from the record and the jury is instructed to disregard it."

It is our conclusion that by this instruction, the trial justice adequately disabused the jury's mind of any prejudicial effect that may have resulted from the reference by the prosecution to the charge of misprision of a felony.

The defendant's appeals are denied and dismissed, and the cases are remanded to the Superior Court.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Asst. Attorney General, *R. Raymond Greco,* Special Asst. Attorney General, for plaintiff.

*William F. Reilly,* Public Defender, *Moses Kando,* Asst. Public Defender, for defendant Loyan Dan Scott, Jr.