STATE

v.

Joseph BOILLARD.

No. 99–473–C.A.

Supreme Court of Rhode Island.

Jan. 31, 2002.

Paula Rosin, Paula Hardiman, Providence, for plaintiff.

Aaron Weisman, Virginia M. McGinn, Providence, for defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

The defendant, Joseph Boillard, has appealed a judgment of conviction of six counts of first-degree child molestation, one count of second-degree child molestation, and one count of assault with a dangerous weapon. For the reasons stated herein, we deny and dismiss the appeal

and affirm the judgment of the Superior Court.

## Facts and Procedural History

On February 27, 1998, defendant was indicted on five counts of first-degree child molestation involving his former girlfriend's daughter, Jane,[1] in violation of G.L.1956 §§ 11–37–8.1 and 11–37–8.2, one count of first-degree and one count of second-degree child molestation involving his girlfriend's son, Henry, in violation of §§ 11–37–8.3 and 11–37–8.4, and one count of assaulting Henry with a dangerous weapon, in violation of G.L.1956 § 11–5–2. Each of the incidents underlying the indictment took place between 1987 and 1992. After a five-day trial in the Superior Court, the jury found defendant guilty on all eight counts.

The defendant's motion for a new trial was denied, and on May 28, 1999, the trial justice entered a judgment of conviction. The defendant was sentenced to thirty years on the first-degree child molestation convictions, with twenty years to serve and ten years suspended, with ten years probation; eight years to serve, concurrent, on the second-degree child molestation conviction; and eighteen months to serve, concurrent, on the assault with a dangerous weapon conviction. The defendant appealed, raising three issues: (1) whether the trial justice erred in overruling defendant's objections to the state's closing arguments; (2) whether the trial justice erred in overruling defendant's objections to leading questions that the state asked of its own witness on direct examination; and (3) whether the trial justice erred in denying defendant's motion for judgment of acquittal on the charge of assault with a dangerous weapon. Additional facts will be presented in the discussion of each of these issues.

## Closing Arguments

■ The defendant contended that the trial justice erred in refusing to sustain his objections to statements that the state made during closing arguments, the state arguing, in response, that defendant failed to preserve any objections for appeal. According to the transcript, defendant voiced two objections during the state's argument, but thereafter did not request curative jury instructions or a mistrial, leading the state to contend that defendant had waived his initial objections.

Our cases have not established a clear, bright-line rule by which trial justices can determine whether remarks by counsel during closing arguments are improper, and if they are, what remedy is required. We have held that ordinarily a defendant must request a cautionary jury instruction or a mistrial in order to preserve for review an objection raised during closing arguments. *State v. Mastracchio*, 546 A.2d 165, 174 (R.I.1988); *State v. Anil*, 417 A.2d 1367, 1373 (R.I.1980). The failure to make such a request, however, does not necessarily preclude review, *id.*, in circumstances in which a request to do so would be futile, either because previous objections were summarily overruled, *State v. Mead*, 544 A.2d 1146, 1150 (R.I.1988); *State v. Plante*, 111 R.I. 386, 391, 302 A.2d 804, 807 (1973); *State v. Mancini*, 108 R.I. 261, 273, 274 A.2d 742, 748 (1971), or, in the case of jury instructions, because the comments to which defendant objected were so prejudicial that "any attempt to palliate the prejudice would have been ineffective." *Anil*, 417 A.2d at 1373.

■ It is our opinion that in this case both objections made by defense counsel in closing argument sufficiently preserved for our review the two issues to which defense

---

1. The minor children are referred to by fictitious names.

counsel objected, namely, the prosecutor's use of the word "repressed" and his explanation of inconsistencies in state witnesses' testimony. Simply stating "Objection" or "I object" may not suffice to preserve an issue in every case, particularly where the objection is uttered outside of closing argument, and its basis is not ascertainable from the context of the argument. In general, if an objector believes that counsel has uttered a highly inflammatory word or comment that leads the opposing party to believe that it has become so prejudiced by the utterance that it has been deprived of a fair trial, then counsel is obliged to seek a conference at side bar, explain the basis for the objection, and request a curative instruction, or, alternatively, request a mistrial and move for a new trial. Because the trial justice here overruled defense counsel's two objections—objections that preserved the issues because the objectionable words or phrases and the bases for the objections were obvious—we turn to the substance of those objections.

■ During trial, Jane had testified that when she was six or seven years old, she saw defendant's daughter, Ruth, then five years old, performing fellatio on defendant in the bathroom of the victims' apartment. Jane also testified that she talked to Ruth afterward, and "asked her if it happened all the time, and she said only when I see my Dad." When she took the stand for the defense, Ruth denied that she had ever had sexual contact with her father or that she had had such a conversation with Jane.

In its summation, the state argued, .
"Who knows exactly what message [Ruth] got from [Jane] at five years of age concerning that and what questions she was really answering when [Jane] asked that question. Who knows exactly what [Jane] saw. She saw what she thought was the same thing that had been happening to her when she was four or five years of age, and it happened to her countless times, going on between the two of them in the bathroom and that's what she believed she saw. Look at [Ruth] in the light most charitable toward her, either she's repressed it and doesn't remember it or * * *."

At that point, defendant made his first objection, the trial justice overruled the objection, and the state continued,
"or what [Jane] saw was him drying her off, drying [Ruth] off, and it wasn't the same act that had been going on between [Jane] and the Defendant for so long. Okay? Or, she's lying. Those are the three explanations for [Ruth]. * * * We don't know. She had somewhat of a motive to lie; it is her father, she's involved with him, * * *. Whether she's lying, whether she's [sic] doesn't remember, whether [Jane] was mistaken about what she saw, any one of those explanations could occur."

The defendant objected again when the state explained the inconsistencies elicited upon defendant's cross-examination of the state's child witnesses, Henry and Jane, as follows:
"Any witness, the most skillful, skillful cross-examination, difficult cross-examination of a child and after the—after the end of, I forget, I guess it was Wednesday afternoon, that child was exhausted, she would have said yes if you asked is the moon made of blue cheese. She was exhausted. You have to understand whatever a witness says is in context into the questioning that they're being asked. That's why, to an extent, when I cross-examined [Ruth], I am attempting to get her answers to get her to tell us what she really does indeed recall and what she doesn't indeed recall. I asked the question slowly and carefully. It

isn't a staccato-style, wouldn't you agree, that every time that he used to do these things, they occurred in the bathroom? Well those types of questions, kids listen and only partly listen to the questions. And I tell them, listen to the question, listen to the question before they go up on the stand, listen to the question. By the time a skilled cross-examiner is through with them, they're no longer listening to the question, they're just saying anything to agree to get off the stand."

The defendant objected, and the trial justice overruled the objection, stating, "This is final argument, it's not evidence."

■ The purpose of closing argument is "to sharpen and clarify the issues for resolution by the trier of fact in a criminal case." *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593, 600 (1975). Only after all the evidence has been presented are counsel for the parties in a position to present their respective versions of the case as a whole. "Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions." *Id.* The challenged arguments in this case were intended to rehabilitate the state's witnesses and to suggest rationales by which the jury could reconcile unfavorable testimony with the state's theory of the case, objectives that are among the intended functions of summation and within the ordinary scope of final argument.[2]

■ A prosecutor is given considerable latitude in closing argument, as long as the statements pertain only to the evidence presented and represent reasonable inferences from the record. *State v. Scott,* 114 R.I. 132, 137, 330 A.2d 66, 70 (1974). We have held that "while there is no formula in law which precisely delineates the proper bounds of a prosecutor's argument, * * * prejudice obviously inheres if the remarks are totally extraneous to the issues in the case and tend to inflame and arouse the passions of the jury." *Mancini,* 108 R.I. at 273–74, 274 A.2d at 748. The probable effect of the prosecutorial statements on the outcome of the case must be evaluated by examining the remarks in the context in which they were made. *State v. Brown,* 522 A.2d 208, 211 (R.I.1987).

■ We are of the opinion that the state's closing statements *sub judice* sug-

---

**2.** Defense counsel was equally expansive in his closing arguments, offering explanations for the unfavorable testimony of adverse witnesses and attempting to persuade the jury that the state's witnesses and the prosecutor were being dishonest. Defense counsel stated in his own summation, for example: "[Henry] wants nothing to do with this. He wants no counseling, he doesn't want no charges and I wouldn't be fooled that he was 16 years old and he's embarrassed to talk about it. * * * He doesn't want anything to do with this, I submit to you because he knows he's stuck, he's stuck for answers * * *." He continued, "he was just pretending that it was painful. I hope you can see right through it." He also stated, "[Jane] testified to inventions, that dream, to inconsistencies with herself and with her mother and the incredibility." De- fense counsel went on, "That's an outright lie by [the victims' mother] to come in here and try and fool you about the video because she knows once the videos go away, the house of cards these kids built fall apart." He further argued, "I submit to you that [the prosecutor] is hiding the truth from you and hiding from the truth himself," and stated, "You know [the prosecutor's] got to call [Jane] and [Henry] credible. I don't know how he can do that with a straight face after what we found out they were saying happened, but when he says all of that, remember you can't find him guilty on this evidence, because three days from now you'll be walking down the street and you'll be wondering because he did not prove his case to you beyond a reasonable doubt."

gesting possible explanations for Ruth's denials and Jane's and Henry's inconsistencies, though conjectural, were within the array of reasonable inferences that could be drawn from the facts presented at trial, and they were neither extraneous nor inflammatory. The credibility of Jane, Henry and Ruth were critical to the case because Jane's and Henry's versions of events were impeached by inconsistencies elicited on cross-examination, and Ruth's testimony directly conflicted with Jane's. Possible explanations for those conflicts were within the proper scope of closing argument. Moreover, the state's single mention of the word "repressed" in connection with Ruth's testimony did not so prejudice defendant that reversal of his convictions is warranted.

The word "repressed," like many others derived from psychoanalytic or behavioral theories, has become a commonly used, descriptive term, apart from its clinical underpinnings, such that its general use in this case can be understood by a person of ordinary intelligence. Just as the word "depressed" has been incorporated into common usage, so also the word repressed has become sufficiently frequently used that the single utterance of the term by the prosecutor did not require an evidentiary foundation.

Moreover, in instructing the jury on the role of closing arguments, the trial justice said:

"It is the duty of lawyers to sum up the testimony honestly as they view it and remember and to base their final arguments on such recollections. If you find that any argument of either lawyer is based upon testimony which you do not accept as true or which you do not agree with, you should discount that argument. Remember that arguments of counsel are not evidence to be considered in determining the truth of the

issues before you. You, the members of the jury, are the sole judges of the facts.

"In instructing you as I'm doing now and the lawyers sometimes in argument, we are permitted to quote or characterize testimony to you. If you find that the quotation or characterization of that testimony either by the Court or by either attorney is not in accordance with your recollection of the testimony, feel free to disregard our comments thereon."

The trial justice also instructed the jury extensively on the factors to be considered in evaluating the credibility of witnesses, including their demeanor, mental capacity, bias, and memory contradictions, and directed, "If you find that any evidence given here is not worthy of belief for any of the foregoing reasons or for any other sensible reason that occurs to you, then you're free to discount it and refuse to give it any weight." By these instructions, the trial justice effectively described the weight that the parties' closing arguments should be accorded by a jury in evaluating the witnesses' testimony. Accordingly, we conclude that the trial justice's refusal to sustain defendant's objections to the state's closing arguments does not warrant reversal.

### Leading Questions

 The defendant next argued that the trial justice erred in overruling his objections to a series of three allegedly leading questions asked of state's witness, Henry, during direct examination. Although a trial justice must act judiciously when making rulings during examination of witnesses at trial, the justice is afforded considerable latitude, and we review such rulings with deference, overturning them only when there has been an abuse of discretion or substantial injury to a defendant. *State v. Girouard*, 561 A.2d 882, 888 (R.I.1989). Moreover, in such cases, we examine the colloquy in context, taking the

prosecutor's questions and the witness's testimony as a whole.

Leading questions are defined as those that suggest a desired answer. *Girouard,* 561 A.2d at 888. "The danger of a leading question is that it may suggest to the witness the specific tenor of the reply desired by counsel and such a reply may be given irrespective of actual memory." *Id.* Although leading questions are generally prohibited on direct examination, such questions may be allowed for the limited purposes of guiding the testimony of a hostile or forgetful witness, *id.,* or of an emotionally distraught juvenile witness reluctant to relate the necessary facts, *State v. Brown,* 574 A.2d 745, 748 (R.I. 1990). After careful examination of the record, we believe that Henry—sixteen years old at the time of trial, and less than ten years old at the time of the events

about which he was testifying—was so clearly reluctant to discuss the necessary details of his ordeal that in the limited context in which they were used, the leading questions at issue were neither objectionable nor prejudicial to defendant.[3] The questions were used to direct Henry's testimony to the desired topics and incidents, not to suggest the tenor of the desired reply. Thus, we hold that the three questions characterized as leading by defendant did not fall within the range of prohibited direct examination. We conclude, therefore, that the trial justice did not err in overruling defendant's objections to these questions.

## Motion for Judgment of Acquittal on Charge of Assault With a Dangerous Weapon

Finally, defendant argued that the trial justice erred in denying his motion for

3. During direct examination, the state inquired about Henry's encounter with defendant:

"Q So on the second floor at South Bend Street, something happened. * * * What happened?

"A Huh? What?

"Q My question is, you said something happened between you and Joseph Boillard while you were living on South Bend Street in your bedroom. What happened?

"A You want me to answer that?

"Q Please, if you can.

"THE COURT: You're going to have to answer.

"A Stuff, I mean, I don't—

"THE COURT: Describe what happened.

"A Bad stuff, I—

"Q When you say 'bad stuff,' did it involve body parts?

"A Yeah.

"Q With respect to you, what body part did it involve?"

At that point, defendant objected. The trial justice overruled the objection, and the witness continued reluctantly, stammering and hesitating in his answers. At one point, the Court instructed the witness, "It may be embarrassing to you, but you're going to have to describe it." The defendant objected when the prosecutor asked the witness, "Now, you said that you had to suck his penis; is that right?" The trial justice responded, "He didn't use that phrase. He says he put his mouth on his penis." Later in his direct examination of Henry, the prosecutor asked,

"Q Okay. Did he threaten you in any way? * * *

"A I can't remember the exact words, I mean, I wouldn't want to sit here and say something that wasn't true. So I couldn't remember the exact words.

"Q At some point did he show something to you?

"A Yeah. Yeah. * * *

"Q Okay. Had something—what did he show to you?

"A Like what? I was shown a lot of things, like what, like what circumstances were you talking about?

"Q At some point, did he show a weapon to you?"

The defendant objected to this question as leading. The trial justice overruled the objection "because at the time this occurred this young man was only seven years old. Our Court has said we can use leading questions under the circumstances."

judgment of acquittal on the charge of assault with a dangerous weapon. He contended that under our pre-*Jackson* definition of assault with a dangerous weapon, such a charge clearly could not be sustained by the evidence presented.

In *State v. Jackson*, 752 A.2d 5, 9–10 (R.I.2000), we promulgated a new definition of the crime of assault with a dangerous weapon. Adopting the standard set forth by the United States Supreme Court in *McLaughlin v. United States*, 476 U.S. 16, 17–18, 106 S.Ct. 1677, 1678, 90 L.Ed.2d 15, 18 (1986), we stated that "we shall presume that an unloaded but operable gun possesses a per se 'present ability to carry the offer [to do corporal injury to another] into effect.'" *Jackson*, 752 A.2d at 10 (quoting *State v. Jeremiah*, 546 A.2d 183, 187 (R.I.1988)). (Alterations in original.) However, as defendant correctly points out, our holding in *Jackson* was prospective. *Jackson*, 752 A.2d at 9. As such, the prior standard, articulated in *Jeremiah*, 546 A.2d at 186–87, is applicable to defendant's case, which was tried in December 1998.

In *Jeremiah*, 546 A.2d at 186–87, we defined assault with a dangerous weapon as

"any unlawful offer to do corporal injury to another under such circumstances as may create a reasonable apprehension of immediate injury unless the person so threatened takes action or inaction to avoid it, coupled with a present ability to carry the offer into effect."

Thus, under the applicable standard, the state was required to prove beyond a reasonable doubt that defendant had a present ability to inflict harm upon Henry. Applying that standard in *State v. Andrade*, 657 A.2d 538, 543 (R.I.1995), we affirmed a conviction of assault with a dangerous weapon, notwithstanding the state's failure to produce a weapon at trial.

We concluded in *Andrade* that the present ability to inflict harm, like any other element of a criminal offense, could be proven by circumstantial evidence or by inference alone. *Id.*

■ In reviewing a trial justice's denial of a motion for judgment of acquittal, we use the same standard as that applied by the trial justice, upholding the denial if, after viewing the evidence in the light most favorable to the state and drawing all reasonable inferences consistent with a defendant's guilt, we agree that the evidence is sufficient to sustain a verdict of guilty beyond a reasonable doubt. *Andrade*, 657 A.2d at 542; *see also Jackson*, 752 A.2d at 8. Henry testified that when he was seven years old—an age at which he could reasonably be presumed to have had the capacity to recognize a gun—he was shown a weapon that "appeared to be a gun." When asked what it looked like, he responded, "I mean, it looked like a gun, I mean, looked like a gun," and later added, "It looked like a—not like a big rifle, you know, it looked like a handgun, something like that." On cross-examination, he testified that the gun was "small" and "black." Viewing this testimony in the light most favorable to the state and drawing all reasonable inferences therefrom in a manner consistent with guilt, we conclude that the state demonstrated that the defendant had a present ability to inflict harm sufficient to sustain the charge of assault with a dangerous weapon beyond a reasonable doubt. Hence, applying the applicable standard to the facts presented, we conclude that the trial justice did not err in denying the defendant's motion for a judgment of acquittal on the charge of assault with a dangerous weapon.

## Conclusion

Therefore, we deny and dismiss the appeal and affirm the judgment of the Supe-

rior Court, to which we return the papers in this case.

GOLDBERG, Justice, concurring in part and dissenting in part.

I concur in the judgment affirming the convictions for first and second-degree child molestation but I would vacate the conviction for assault with a dangerous weapon. I am not satisfied that the state presented evidence sufficient to survive a motion for a judgment of acquittal relative to whether the defendant possessed a firearm with a present ability to inflict harm. Indeed, I am of the opinion that the state presented no proof establishing this essential element of the crime of assault with a dangerous weapon. Accordingly, I would affirm in part and reverse in part.

General Laws 1956 § 11-5-2, entitled "Felony assault," provides for a maximum penalty of twenty years imprisonment for anyone found in violation of its provisions. Prior to our holding in *State v. Jackson,* 752 A.2d 5 (R.I.2000), an essential element of the crime of assault with a dangerous weapon was an actual and present ability to inflict harm to the victim. In the case of a firearm, this means a weapon that is loaded and operable. The defendant's actual ability to inflict harm is what distinguishes the crime of felony assault from that of misdemeanor assault. As the testimony in this case clearly demonstrates, there is no evidence that the defendant had a present ability to inflict harm to this victim, whatsoever. The victim's direct examination testimony relative to the existence of a weapon consists of the following:

"Q At some point, did [the defendant] show a weapon to you?

* * *

"A At that point, I guess at that age, it appeared to be a gun.

* * *

"Q Okay. When you say you think it was a gun, would you tell me, if you can close your eyes, can you remember it, what it looked like?

"A I mean, it looked like a gun, I mean, looked like a gun.

"Q Okay. I guess it doesn't—I guess there are lots of kinds of guns.

"A Yes, there is [sic].

"Q Okay. There's rifles, there's pistols.

"A It looked like a—not like a big rifle, you know, it looked like a handgun, something like that.

"Q A handgun?

"A Yeah, something like that.

"Q Okay. Do you know—do you know the difference between a revolver and an automatic?

"A At that point, no, I wouldn't be able to tell you. I couldn't tell you if it was—I know it was something that you handle, you know, what I mean? I mean, it's not something I could tell you if it's an automatic or revolver or anything like that, you know.

"Q But you do know the difference— now you know the difference?

"A Now I know the difference, but back then, I couldn't."

On cross-examination, he testified as follows:

"Q What did the gun look like?

* * *

"A I told you, it was small.

"Q What else?

"A I told you. It was—I know it was black."

This testimony is markedly different from the facts in *State v. Andrade,* 657 A.2d 538, 539 (R.I.1995), wherein we upheld a felony assault conviction notwithstanding the inability of the state to produce a firearm. In *Andrade,* the weapon

was specifically described as "a steel-gray firearm" that was "probably a 9–millimeter pistol because it did not have a revolver barrel." *Id.* at 540. Moreover, Andrade not only aimed the firearm at both victims at close range, one victim was ordered to lie down on his bed while Andrade rifled through his possessions, and was informed that it was his lucky day and that Andrade would not shoot him but rather he would "shoot a hole in [his] mattress." *Id.* This Court held, based upon the detailed description of the firearm and the nature of the threats made by the defendant, that a jury could reasonably have inferred that Andrade inflicted an assault with a dangerous weapon upon each victim. Again, we emphasized the close proximity of the firearm to each victim and the oral threat made by the defendant that he was "going to shoot a hole in your mattress." *Id.* at 543.

In *State v. Jeremiah*, 546 A.2d 183 (R.I. 1988), this Court declared the law of assault with a dangerous weapon as:

> "[A]ny unlawful offer to do corporal injury to another under such circumstances as may create a reasonable apprehension of immediate injury unless the person so threatened takes action or inaction to avoid it, coupled with a present ability to carry the offer into effect." *Id.* at 186–87.

I am not satisfied that the testimony in this case, consisting of "I *guess* it appeared to be a gun," "it looked like a gun," "it looked like a handgun, *something like that*" and "it's not something I could tell you if it's an automatic or revolver *or anything like that*," (emphasis added), is sufficient to survive a motion for a judgment of acquittal. This evidence, even when viewed in the light most favorable to the state, fails to establish that defendant was in possession of a loaded weapon with a present ability to inflict death or serious

bodily injury upon anyone. Consequently, I dissent.