DECISION
Before this Court is Plaintiffs' Motion for Costs and Fees. Plaintiffs contend that Defendant should reimburse Plaintiffs for their first trial costs and attorneys' fees because Defendant's improper closing argument caused a mistrial. Defendant objects. This Court heard argument on October 19, 2009. For the reasons discussed below, this Court directs Defendant to pay a specific portion of Plaintiffs' attorneys' fees and costs. Jurisdiction of this matter is pursuant to this Court's inherent powers as an equity court.See G.L. 1956 § 8-2-13.
 I Facts and Travel
Sinnara Vann ("Sinnara") was born at Women Infants Hospital in Providence, Rhode Island on November 23, 2000. Following a non-routine, shoulder dystocia delivery, Sinnara sustained an injury to his right-side brachial plexus. It is alleged that three or four of Sinnara's cervical spinal nerves (C5-C8) were at least partially avulsed from their root connections to his spinal cord, resulting in a permanent injury to Sinnara's right arm.
This Court notes — with respect to the within malpractice action that followed — that all trial counsel are seasoned litigators who have distinguished themselves as exhaustive and tenacious advocates in the medical negligence arena. Each is highly skilled and well-versed in *Page 2 
the rules of evidence, procedure, and applicable substantive law. This Court holds all advocates, including those with such credentials, to a high standard of professionalism.
At trial, Plaintiffs presented several medical experts to establish that excessive traction applied to Sinnara's head and neck by Defendant's delivery room doctors caused Sinnara's injuries. Defendant then sought to offer two experts — Dr. Jay Goldberg ("Dr. Goldberg") and Dr. R. K. DeMott ("Dr. DeMott") — to refute Plaintiffs' causation theory and present its alternative argument that natural forces caused Sinnara's injuries. Prior to and during trial, Plaintiffs filed motions in limine challenging the admissibility of Dr. Goldberg's and Dr. DeMott's testimony. This Court's evidentiary rulings on Defendant's two experts are of particular relevance to the mistrial and Plaintiffs' instant request for costs and fees.
Through these motions, Plaintiffs requested orders prohibiting these experts from testifying to the cause of Sinnara's injuries. Before ruling on Plaintiffs' motions, this Court permitted voir dire of Dr. Goldberg and held a Rule 104 hearing relative to Dr. DeMott to investigate the content and bases of their respective testimonies. This Court ruled that Dr. Goldberg could testify only to the obstetrical standard of care and could not testify to causation. (Trial Tr. 7:11-8:4, June 5, 2009 Afternoon.) The Court expressly disallowed any suggestion by Dr. Goldberg that other factors — such as the mother's propulsive birthing forces — may have caused or contributed to Sinnara's injuries. (Trial Tr. 57:7-60:17, June 5, 2009 Morning);[1] *Page 3 
(Trial Tr. 1:4-8, June 5, 2009 Afternoon) (This Court stated: "[Dr. Goldberg's] testimony about how this injury could have happened for a variety of reasons out there is not enough. I'm not going to let him talk about that."). This Court held that the basis of Dr. Goldberg's causation opinion was "unsound" and was not supported to a reasonable degree of medical certainty. (Trial Tr. 7:20-23, June 5, 2009 Afternoon.) In accordance with the Court's directives, Dr. Goldberg testified within the bounds of this ruling on June 5, 2009 and June 11, 2009. On this later date, this Court entertained another objection from Defendant regarding this Court's limitations on Dr. Goldberg's testimony. After additional questioning, this Court reaffirmed that Dr. Goldberg could testify only as to the applicable standard of care and could not "testify to a reasonable degree of medical certainty that anything's possible" as the cause of Sinnara's injuries. (Trial Tr. 1:24-2:7, June 11, 2009 Morning.)
Regarding Dr. DeMott's Rule 104 hearing, this Court ruled that his testimony, like Dr. Goldberg's, would be limited to the standard of care of delivery room doctors. (Trial Tr. 27:18-22, June 11, 2009 Afternoon.) This Court agreed with Plaintiffs' argument that Dr. DeMott's opinion on causation — rapid second stage delivery forces[2] can cause brachial plexus injuries — was not supported to a reasonable degree of medical certainty and was not sufficiently relevant to Sinnara's case. Id. at 8:23-9:12. Essentially, Dr. DeMott did not provide any explanation to *Page 4 
connect the existence of propulsive birthing forces with the cause of Sinnara's specific injuries. Id. at 8:7-22. His opinion expressed only that the forces were possible factors to brachial plexus injuries in general, rather than probable causes of Sinnara's brachial plexus injury. Id. at 11:22-25; 22:2-6 ("At his deposition, Dr. DeMott clearly testified no one has correlated this phenomenon [rapid second stage leads to brachial plexus injuries] to the actual injury [Sinnara's cervical avulsions]."). Furthermore, during the Rule 104 hearing, this Court expressed disapproval that Dr. DeMott cited a study that involved brachial plexus injuries in the absence of shoulder dystocias because such circumstances were not present in the instant case. Id. at 23:15-19. As it is undisputed that Sinnara experienced shoulder dystocia during his birth, this Court found any presentation of research on brachial plexus injuries that occurred without shoulder dystocias to be a red herring and held the potential of confusing the jury. Id.
Dr. DeMott was therefore prohibited from testifying on the topic of causation.[3] Id. at 27:18-22 ("Dr. DeMott, like Dr. Goldberg, will be able to give his opinions . . . relative to the standard of care, not beyond that, not beyond that.").
During final argument, Defendant displayed excerpted trial testimony given by Plaintiffs' biomedical expert, Dr. Robert Harry Allen ("Dr. Allen"). Thereafter, based on Dr. Allen's statements, Defendant argued that Plaintiff's expert had acknowledged that there were other *Page 5 
possible causes or contributing factors for Sinnara's specific injury.[4] This Court disagreed that Dr. Allen had so testified. As such, Defendant's closing argument contained a theory of causation that was unsupported by a scientific, medically probable basis in the record. Furthermore, Defendant's strategy clearly circumvented this Court's prior rulings relative to the testimony of Dr. DeMott and Dr. Goldberg by proceeding with a presentation of its "anything is possible" causation theory. (Trial Tr. 80:24-82:11, June 17, 2009.) Taking Dr. Allen's excerpts out of context, Defendant injected into the case two causation theories that this Court had already *Page 6 
prohibited: that Sinnara's injury happened due to in utero forces or due to his lack of tone at birth. Id. ("Defendant visited in his closing an area of discussion, the `possibilities' discussion that I had previously prohibited. Defendant circumvented those prior rulings and it was disingenuous."). Accordingly, this Court declared a mistrial and passed the case on June 17, 2009.[5]
Thereafter on July 16, 2009, Plaintiffs filed the instant Motion arguing that Defendant's improper closing caused the mistrial and, in the interest of justice, Defendant should reimburse Plaintiffs for all their trial expenses. Defendant objected to Plaintiffs' Motion, and on October 19, 2009, this Court afforded both parties an opportunity to be heard.
 II Analysis A Authority of This Court To Award Costs and Attorney's Fees
Plaintiffs move for costs and fees. They maintain that they do not seek sanctions or a finding of contempt, and their motion is entitled a request for costs and fees, rather than sanctions. Defendant responds that the within request for fees and costs constitutes a request for sanctions, despite its nomenclature.
Our Supreme Court staunchly observes the "American rule" that holds each litigant responsible for its own attorney's fees absent statutory authority or contractual liability. Moore v.Ballard, 914 A.2d 487, 489 (R.I. 2007) (citing Eleazer v. TedReed Thermal, Inc., 576 A.2d 1217, 1221 (R.I. 1990)). This rule prohibiting fee shifting, however, is subject to exceptions. Id. On multiple occasions, our Supreme Court has recognized that courts have the "inherent power *Page 7 
to fashion an appropriate remedy that would serve the ends of justice." Vincent v. Musone, 574 A.2d 1234, 1235 (R.I. 1990);see, e.g., Jem Co., Inc. v. Fairway CapitalCorp., 678 A.2d 1247 (R.I. 1996) (stating that "we acknowledge, however, that in an appropriate case this Court may exercise its inherent power to fashion a remedy concerning counsel fees that would serve the ends of justice"); Truk Awayof R.I. v. Macera Bros. of Cranston,643 A.2d 811, 817 (R.I. 1994) (imposing both usual costs of the action and attorneys' fees by virtue of its inherent power).
Specifically, in Vincent v. Musone, our Supreme Court exercised its inherent power to award attorneys fees and costs to further the ends of justice. 574 A.2d at 1235. In that case, justice was served by an award of a counsel fee to defense counsel as a result of an inordinate delay by the plaintiff in amending a complaint, resulting in a remand. Id. The Court crafted this "fair solution [that called] for payment by the plaintiff of the reasonable expenses incurred by the defendants in connection with the first trial, including reasonable counsel fees." Id.
With respect to this inherent power to impose fees and costs, this Court notes the exercise of such is limited to "unique circumstances" when this imposition is "the only remedy available at the time." Blue Cross Blue Shieldof R.I. v. Najarian, 911 A.2d 706, 710 (R.I. 2006). InNajarian, the Rhode Island Supreme Court found that only unique circumstances — as for example, those in Truk Awayof R.I. which involved the wrongful issuance of an injunction from a public contract award — merited a court's deviation from the American Rule. Id. at 710-11.
 B Circumstances Warranting the Imposition of Attorney's Fees and Costs
This Court has the inherent power to award attorney's fees and costs to a party in unique circumstances when that remedy would serve the ends of justice and no other remedy is available. SeeNajarian, 911 A.2d at 710; Truk Away of R.I., Inc.,643 A.2d at 817; Vincent, 574 A.2d at 1235. Here, this Court cannot impose a sanction against Defendant for willfully *Page 8 
disobeying a court order in the absence of clear and convincing proof that counsel violated an express order of the Court. SeeNow Courier, LLC v. Better Carrier Corp.,965 A.2d 429, 436 (R.I. 2009). At trial, the Court did not specifically direct Defendant to refrain from using Dr. Allen's testimony to introduce its alternate causation theory, nor did the Court issue an order specifying the parameters of final argument. Furthermore, the Court was never called upon to rule on the "anything's possible" argument as it related to Dr. Allen, nor did either party file a motion in limine to limit the use of Dr. Allen's testimony during final argument. Accordingly, sanctions are not applicable to these circumstances.
With respect to the final argument, Defendant maintains that given an advocate's broad ability to summarize and argue in closing, its efforts to cast doubt on Plaintiffs' excessive traction causation theory cannot be the basis for an attorney's fees or cost award to Plaintiffs. Defendant relies heavily on State v. Boillard,789 A.2d 881, 885 (R.I. 2002), to justify the use of Dr. Allen's testimony to introduce the "anything is possible" theory of causation to the jury. In Boillard, the court allowed the elements of the State's closing argument, which touched upon alternate explanations for the alleged victim's denials of sexual assault. Id. at 883. Defendant argues that because the State in Boillard was permitted to offer alternate explanations of the alleged victim's lack of memory, it too should be able to "poke holes" in Plaintiffs' causation theory using alternate explanations of Sinnara's injuries, allegedly raised by Dr. Allen in his testimony. Thus, Defendant maintains that it does not have to introduce its own expert to disprove Plaintiffs' assertion that excessive traction was the cause of Sinnara's injuries.See Wilder v. Eberhart, 977 F.2d 673, 677 (1st Cir. 1992) (applying New Hampshire law, which is analogous to Rhode Island law, and stating that a "Defendant need not disprove causation. . . . Defendant need not prove another cause; he only has to convince the trier of fact that the alleged *Page 9 
negligence was not the legal cause of injury"). Effectively, Defendant argues that it "is under no obligation to disprove that which the plaintiffs . . . assert or claim; rather the plaintiffs must prove that which they assert or claim."Woodward v. United Transit Co.,94 R.I. 446, 450, 181 A.2d 622, 624 (R.I. 1962).
This Court recognizes that the closing argument permits an advocate to raise "reasonable inferences from the record" and argue its version of the case to the jury. See Boillard,789 A.2d at 885 (citing State v. Scott,114 R.I. 132, 137, 330 A.2d 66, 70 (1974)). Nonetheless, a trial justice has considerable discretion to find certain remarks during closing arguments improper and to choose the appropriate remedy for these remarks. See, e.g., State v. Hak,963 A.2d 921, 929 (R.I. 2009) (stating that the decision to declare a mistrial is left to the discretion of the trial justice because "the trial justice has a `front row seat' during the trial [thus] he or she `can best determine the effect of the improvident remarks upon the jury'" (quoting State v. Figueroa,673 A.2d 1084, 1091 (R.I. 1996)); State v. Ensey,881 A.2d 81, 95 (R.I. 2005) (finding that cautionary instructions are one appropriate remedy for improper remarks during a closing argument (citing Boillard, 789 A.2d at 883)). In a number of cases, both civil and criminal, the Rhode Island Supreme Court has found to be inappropriate those remarks that involve name-calling, stray from evidence properly admitted at trial, and inflame and arouse the passions of the jury. However, their inclusion at closing arguments, which are not evidence, neither necessitates the mistrial nor constitutes harmless error if a mistrial is denied.See, e.g., State v. Horton,871 A.2d 959, 965-66 (R.I. 2005) (finding that despite the prosecutor's characterization of the defendant as a "monster" in closing argument, the denial of a mistrial could not rise beyond the level of harmless error); Boillard,789 A.2d at 883-86 (stating that a cautionary instruction to the jurors after certain inappropriate remarks during a closing argument served as a proper remedy); *Page 10 Lariverie v. Dayton Safety Ladder Co.,525 A.2d 892, 899 (R.I. 1987) (finding no error in the trial justice's denial of a motion to strike plaintiff's introduction of a "brand-new theory" during the closing argument because counsel was making inferences from the expert's testimony).
Conversely, in the unique circumstances of this case, Defendant's remark was not only improper, but the Court had expressly prohibited Defendant from referencing the "anything is possible" causation theory. Although this prohibition was prompted by motions relative to the testimony of Drs. Goldberg and DeMott, the "anything is possible" argument has no place in medical malpractice litigation regardless of which party proffers the theory or through which witnesses. See Ferguson v. Wayland Manor Assocs.,771 A.2d 888, 892 (R.I. 2001) ("We have frequently held that to be admissible, an expert must testify in terms of probability and not possibility." (citing Simon v. Health-Tex, Inc.,490 A.2d 50, 51 (R.I. 1985); Montouri v. Narragansett ElectricCo., 418 A.2d 5, 10 (R.I. 1980); Sweet v. Hemingway Transp.,Inc., 114 R.I. 348, 355, 333 A.2d 411, 415 (1975)). Nevertheless, counsel went forward with a presentation of this precluded theory by manipulating Dr. Allen's actual testimony.
Although Plaintiffs have the burden of proof, including the burden to prove causation, it does not follow that Defendant may introduce a medical causation theory that lacks valid expert support — particularly in the face of this Court's prohibition of referencing such causation theory. See Ferguson,771 A.2d at 892 (citations omitted). Here, Defendant explicitly told the jury that Dr. Allen presented "another important piece of this puzzle as to how the child was injured" and then pried out of context Dr. Allen's statement that "there are — in fact there are many causes of brachial — permanent brachial plexus injuries in the newborn" when making its final argument. Dr. Allen did not testify that Sinnara experienced these other factors or that they contributed to his injuries, nor did Dr. Allen suggest another "piece of the puzzle" for the jury to consider. Dr. Allen, *Page 11 
like Plaintiffs' other experts, stated to a reasonable degree of medical certainty his opinion that Sinnara suffered an excessive traction injury. Dr. Allen acknowledged that in the realm of all medical possibility, there are documented cases of brachial plexus injuries occurring in the absence of excessive traction. However, he did not state that there was any question that these factors were involved with or probable causes in the instant case. In fact, Defendant clearly was on notice that its multi-factor, "anything is possible" causation theory was off-limits based on this Court's orders relative to the testimony of Dr. DeMott and Dr. Goldberg. Nonetheless, Defendant chose to convey to the jury that Dr. Allen's testimony provided a basis for the disallowed causation theory. Accordingly, this case presents unique and different circumstances from those involving mere improper statements during a closing argument. Cf. Horton,871 A.2d at 965-66; Boillard, 789 A.2d at 883-86.
Defendant further relies on Lariverie to argue that using Dr. Allen's testimony to "poke holes" in Plaintiff's causation theory was allowable. See 525 A.2d at 899. Defendant argues that it may "connect the dots" between the facts in the instant case and Dr. Allen's acknowledgment of other factors related to brachial plexus injuries in general. In Lariverie, a personal injury case wherein a plaintiff fell from a negligently designed ladder, the plaintiff's expert stated that among other causative factors for the break, [6] "the more you increase the slope [of the wood], the greater the weakness, because the spring wood, the low density component of the wood, becomes more active in resisting fracture." Id. at 894. In its closing, the Lariverie *Page 12 
plaintiff "claimed that the defendant violated the ANSI[7]
standards and or [sic] the OSHA[8] standards by creating and manufacturing a product which was less dense than allowed by the standard." Id. at 899. The defendant objected, contending that this closing argument was a brand new theory not supported by evidence in the record because the plaintiff's expert never actually stated that the density of the wood violated OSHA or ANSI.Id. The Lariverie Court permitted the plaintiff's closing statement because his expert had testified that the low density of the spring wood was at least one cause of the fracture and the ANSI wood density standard, which states that in the manufacture of portable wood ladders "low density wood shall not be used," was admitted into evidence. Id. at 889. Thus, inLariverie, it was proper for the plaintiff to "connect the dots" — the existence of low density wood, the expert's opinion that low density wood was a causal factor in that case, and the ANSI standard for low density — despite its expert not explicitly making the statement that the wood violated an ANSI standard. Id.
Essentially, the plaintiff did, in fact, make a proper inference from the evidence in the record during its closing.
In the instant case, unlike Lariverie, Dr. Allen simply stated that in the expanse of all brachial plexus research, there is some evidence that decreased tone or the forces of childbirth can contribute to these types of injuries. Dr. Allen did not say that these were factors at issue in the instant case. Thus, while the Lariverie expert said that low density was a cause for the ladder rung to break, and the trial judge never specifically prohibited such testimony. Here, Dr. Allen never said that tone or propulsive forces were causes of Sinnara's cervical avulsions, and this Court had already prohibited such testimony from Dr. Goldberg and Dr. DeMott. In contrast to the circumstances ofLariverie, those of the instant case are unique because counsel's final *Page 13 
argument was in derogation of record evidence, and this Court explicitly disallowed the referencing of this very causation theory.
As such, regardless of Defendant's motives, upon examination of the record, this Court finds that these unique circumstances caused a mistrial and warranted costs and fees. SeeNajarian, 911 A.2d at 710; Vincent, 574 A.2d at 1235. Defendant circumvented this Court's rulings on causation and disregarded well established legal principles by putting forth the "anything is possible" theory in the context of Dr. Allen's testimony. See Ferguson, 771 A.2d at 892 (citations omitted). Without introducing admissible evidence to support its causation theory and while on notice that this Court was not satisfied with Dr. Goldberg and Dr. DeMott's proffered testimony on causation, Defendant nonetheless suggested that Dr. Allen's mere mention of general possibilities served to negate his medically certain conclusion that excessive traction was the most probable cause of Sinnara's permanent injuries in the instant case. Thus, this argument rose above the level of mere improper statements in closing. Cf. Lariverie, 525 A.2d at 899 (permitting the plaintiff to "connect the dots" in its closing statement). In these unique circumstances, no other remedy — besides the use of this Court's inherent power to award costs and fees to the Plaintiff — is available to serve the ends of justice. SeeNajarian, 911 A.2d at 710; Truk Away of R.I., Inc.,643 A.2d at 817; Vincent, 574 A.2d at 1235.
 C Remedy
Plaintiffs seek reimbursement for costs and fees incurred during the trial. This Court has the authority to fashion remedies under its supervisory and revisory powers. Cheetham v. Cheetham,121 R.I. 337, 342, 397 A.2d 1331, 1334 (1979) (citations omitted). Finding the circumstances of this mistrial unique and warranting an appropriate remedy, this Court will exercise its inherent powers to serve the ends of justice. See Najarian, 911 A.2d at 710;Truk *Page 14 Away of R.I., Inc., 643 A.2d at 817; Vincent,574 A.2d at 1235. In this case, the Court fashions a remedy that compensates the Plaintiffs for some, but not all, of their costs and fees incurred during the presentation. To award Plaintiffs either all or none of their costs and fees would not serve the legitimate goal of crafting a fair solution. See Vincent,574 A.2d at 1235 (crafting a "fair solution" through the exercise of the court's "inherent power to fashion an appropriate remedy that would serve the ends of justice").
Accordingly, this Court equitably fashions a remedy that requires Defendant to reimburse Plaintiffs for attorneys' fees and costs related to Dr. Allen's appearance at the first trial. This remedy shall not include any discovery or pre-trial preparation expenses for Dr. Allen that may be reused in a new trial.
This Court directs Plaintiffs' counsel to prepare an accounting of its expenses and attorneys' fees relative to Dr. Allen and submit a copy to this Court for its review.
Counsel also shall prepare and submit the appropriate judgment for entry in accordance with this Decision.
[1] During his voir dire, Dr. Goldberg articulated a variety of factors that can contribute to brachial plexus injuries and may have been at work in Sinnara's case. According to Dr. Goldberg, these factors include: "the natural forces of labor," "the forces of the contractions," "if the mother changes position during delivery," "the maneuvers needed to deliver the baby," "the baby's resistance to stretch injury," and "the force — the rate at which the baby delivers." (Trial Tr. 57:14-59:3, June 5, 2009 Morning); (Trial Tr. 63:3-14 June 5, 2009 Afternoon.) When pressed to state his opinion as to which force was the probable cause in this case, Dr. Goldberg agreed that he could not "offer[] an opinion as to what caused [Sinnara's] injury to a reasonable degree of medical certainty . . . [his] opinion [is] that there are many possible contributing factors." Id. at 59:16-20. Dr. Goldberg also agreed that he could not "quantify" which of the factors "had more or less of a contribution to the ultimate injury in this case."Id. at 60:2-17.
[2] Second stage refers to the time frame during labor when a mother is working with her contractions to push and deliver her baby. "Rapid" second stage indicates that the delivery happens more quickly than is typical. (See Trial Tr. 35:4-17, June 17, 2009) ("You remember Dr. Gurewitsch told you second stage, when mom first gets into second stage, that's when she's dilated until she delivers the child, that usually lasts, for 80 percent of the patients that have had babies before, about 50 minutes to an hour. Only 10 percent deliver in under ten minutes, and [Dr. Gurewitsch] told you about the 10 percent that deliver beyond 10 minutes, but most babies, it's going to take about somewhere in that 50-minute time range. And that's what makes [Sinnara's instant case] precipitous. This was one of those babies that didn't fall in the average.").
[3] During the June 11, 2009 Rule 104 hearing for Dr. DeMott, Plaintiffs presented this Court with a litany of evidentiary problems relative to Dr. DeMott's testimony. This Court took note that the only disclosed support for Dr. DeMott's opinion was the work of Dr. Acker, whose brachial plexus research did not account for the variable of physician excessive traction and only examined a small sample size. (Trial Tr. 4:18-5:19 June 11, 2009.) The Plaintiffs also focused on the fact that Dr. DeMott was not current on all brachial plexus injury research, including a large-scale study conducted in Sweden, the Metaizeau study conducted in France, and any of the post-19th century cadaver studies, all factors which called into question his qualifications as an expert.Id. at 6:16-7:16.
[4] For example, Defendant's attorney stated in his closing argument:
 "And what did Dr. Allen tell us? `Doctor, would you agree that in the literature that you have reviewed in the course of years doing this, in the literature has been reported permanent brachial plexus injuries that occurred without physician traction and without shoulder dystocia?' `Yes, they occur intrauterine. There are — in fact there are many causes of brachial — permanent brachial plexus injuries in the newborn.' That's Dr. Allen, another one of their experts." (Trial Tr. 46:4-13, June 17, 2009.)
 "Now, there's another important piece of this puzzle as to how the child was injured that was talked about even by the [P]laintiff[s'] experts [who explained the role of muscle tone in the incidence of brachial plexus injuries]." Id. at 55:15-17.
 ". . . [A]nd I said `Doctor [Allen], you've talked about in your papers whether or not tone, muscle tone is something that might predispose a child in utero when they're being delivered to suffering a brachial plexus injury, correct?' His answer, `Yes.'" Id. at 55:19-25.
 "Does it make sense to say, when everybody says Dr. Watabe, who had delivered a shoulder dystocia baby before, had applied gentle downward traction, does it make sense that we should ignore that and, because there was an injury, conclude that somehow it was Dr. Watabe's fault, when we know from their own experts what actually happened to the child?" Id. at 56:25-57:5.
 "What we do know is that, like what Dr. Allen said about these forces occurring in utero, is that both the training and education of all the doctors is that, in fact, these forces can and do occur in utero." Id. at 59:20-24.
[5] Also noteworthy, during the on-the-record sidebar conference concerning Defendant's closing argument, Plaintiffs requested that this Court issue a curative instruction to the jury, while Defendant specifically moved for the Court to declare a mistrial and pass the case. (Trial Tr. 76:14-23, 80:16-18, June 17, 2009.)
[6] The plaintiff's expert "observed that the groove cut into the right leg to accommodate the step as well as the hole used to insert a clamp that was put in to join the step to the right rail were `factors [that] tend[ed] to weaken the rail at that point . . . in addition [to having] a very weak rail to begin with because of the condition of the wood.'" Lariverie, 525 A.2d at 894. The expert also pointed to slope in the cross-grain of the wood as a factor for the break, which did not meet OSHA standards.Id.
[7] "ANSI" refers to the American National Standards Institute.
[8] "OSHA" refers to the Occupational Safety and Health Administration.
 *Page 1