**Supreme Court**

No. 2011-203-C.A.

(P1/09-615A)

State                         :

v.                         :

Raymond Clements.                         :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                      :

v.                        :

Raymond Clements.        :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**  In the early morning hours of June 14, 2007, two young women were brutally murdered, and their bodies set on fire.  Apparently, the women were the victims of their attackers' decision not to succumb to the demands of one of them for money in exchange for silence about the attackers' perpetration of insurance fraud.  The defendant, Raymond Clements, was charged with two counts of murder, one count of conspiracy, and one count of arson arising out of the June 14, 2007 incident.  Eventually, Clements was tried before a jury and convicted on all counts.  The trial justice sentenced the defendant to three consecutive life sentences, one each for the murders of Heather Jesus and Amanda Sousa and another for the arson count, plus ten years for the conspiracy count, to be served concurrently with the final life sentence.  After his conviction, the defendant timely appealed to this Court.  On appeal, he argues that the trial justice erred by admitting evidence of a robbery committed on June 13, 2007,

- 1 -

the day before the murders; by failing to instruct the jury of the use it might make of that evidence; and by denying the defendant's motion to pass the case. We have considered the parties' written and oral arguments and thoroughly examined the record. For the reasons set forth in this opinion, we affirm the judgment of conviction.

# I

## Facts and Travel

A fire on the third floor of an apartment building on Plainfield Street in Providence led police to the discovery of two charred bodies, one on top of the other. Although the bodies were severely damaged by fire, they were later identified as the remains of cousins Heather Jesus and Amanda Sousa. After an autopsy was conducted, the medical examiner determined that Sousa's death was caused by multiple blunt- and sharp-force injuries.[1] The medical examiner counted dozens of sharp-force wounds to the head and torso of Sousa, including one wound that severed her windpipe.

Jesus' violent death was determined to have been caused by sharp-force injuries and asphyxia as a result of neck and chest compression, and it was determined that her windpipe was similarly cut, with that injury having been inflicted after the bruising on her neck. Both deaths were deemed to have been homicides. The defendant, Raymond Clements, and Anthony Carter were later charged with the murders.[2]

---

[1] According to the medical examiner, a blunt-force injury is caused by an object that has no sharp edge and is not capable of making a cut, while a sharp-force injury is caused by an object that has a sharp edge and is capable of making a cut.

[2] Carter was charged with and later pleaded guilty to the first-degree murder of Sousa, the first-degree murder of Jesus, the conspiracy to murder Sousa and Jesus, and first-degree arson.

The defendant and Carter had been close friends since they met in approximately 1996 at the Rhode Island Training School, where they both were incarcerated for juvenile offenses.[3] The juvenile system apparently was not successful with the pair, as each "graduated" to the Adult Correctional Institutions (ACI) as a result of criminal convictions. After Carter was released from prison on June 1, 2007, he and defendant resumed their close relationship, and they spent considerable time together. Carter spent his nights following his release from prison either at his grandmother's home or at defendant's home, where defendant lived with his wife and son. Carter's sister Jessica, who had eloped from a group home, also stayed with defendant's family in early June of 2007.

Anthony Carter, who testified on behalf of the state, said that he met Jesus and Sousa for the first time in the overnight hours of June 5 to 6, 2007, within days of his release from prison. He encountered Jesus for the first time when he and defendant patronized her workplace, the Sportsman's Inn, a strip club in Providence. The pair made arrangements to see Jesus when she completed her work shift. Carter and Clements picked up Sousa at her house; the trio then traveled to Jesus' apartment. Although Carter had just made Jesus' acquaintance, defendant had known her for many years.

On June 8, 2007, Clements, Carter, and Sousa were involved in an accident while they were traveling in defendant's car. The three abandoned the car, but Carter testified that, after the accident, he listened as defendant instructed his wife to report the car stolen on two separate occasions: once over the telephone immediately after the crash, and again after they returned to

---

[3] General Laws 1956 § 42-56-33 provides: "The department of corrections shall maintain a school to be known as the training school for youth for the detention of children by order of the [F]amily [C]ourt and for the confinement, instruction, and reformation of children found delinquent or wayward by the [F]amily [C]ourt."

- 3 -

Clements's apartment. Now deprived of their only mode of transportation, Carter and defendant secured the agreement of Carter's grandmother to rent a car for them.

According to Carter, on June 11 or 12, Sousa telephoned him with a threat that she would inform the police about the accident and false police report unless he and defendant paid her the sum of $500 every Friday. Because Carter and defendant were together at the time of this call, they discussed Sousa's demand between themselves. Carter testified that he and defendant agreed that they would not pay and that they had "to take care of the situation." When Sousa called again, Carter informed her that neither he nor defendant would meet her demand; she then repeated her threat, but she also agreed to talk to Carter and Clements. Carter testified that, after this second call, defendant said that "[t]hey got to go." Carter understood that to mean that Sousa and Jesus should be killed.[4] Carter said that, although he agreed to the murders, he wanted to spend some time to plan the killings. The defendant, however, said that "it had to be done ASAP." Carter testified that he was nervous about killing anyone, but he agreed to the scheme because "that [wa]s the type of relationship [he and defendant] had."

Clements and Carter arrived at Jesus' apartment in the final hours of June 13, 2007, retrieved gloves from the back of the station wagon that Carter's grandmother had rented for them, and went inside. Carter testified that Clements was unwilling to kill Jesus because he had known her for a long time. Therefore, the pair agreed that Carter would kill Jesus, and Clements would kill Sousa. After the group smoked marijuana and socialized for a while, Clements and Sousa left the room, with Clements saying that he was going to repair a door in the kitchen.

---

[4] Carter said that, although Jesus had never asked for any money, he and defendant decided that they had to kill both of the women. They reasoned that, if they killed only Sousa, then Jesus would know that they had been the perpetrators.

- 4 -

However, he also began ominously twirling his finger in a gesture that Carter understood to mean that it was time to put the plan to kill Jesus and Sousa into action.

A short time later, Carter grabbed Jesus and strangled her. After he had choked Jesus to death, Carter saw Sousa and defendant return from the kitchen, bloody and in the midst of a deadly struggle. Clements was, according to Carter's testimony, wielding a railroad spike as a weapon. The struggle subsided temporarily while Sousa, on her knees, pleaded with Clements to stop; Carter said that, although defendant assured Sousa that he would call an ambulance and the police, he instead viciously kicked her in the head, which ended the fight. The defendant then instructed Carter to "cut her throat." After Carter retrieved a knife and severed Jesus' throat, defendant said that he had been referring to Sousa, not Jesus. The defendant then did the same thing to Sousa, using a different knife.

Clements and Carter attempted to conceal the evidence of their actions by cleaning the apartment and placing certain items into trash bags that they later threw into a dumpster in Pawtucket and burned. According to Carter, defendant instructed him to find some flammable material so that they could burn the bodies of Sousa and Jesus in an attempt to destroy evidence. Clothes, newspapers, and pillows were piled on the bodies, which were then doused with perfume and WD-40 and set alight.[5] The resulting fire led police to the apartment, where the bodies were discovered.

The duo retreated to defendant's apartment, where Jessica Carter opened the door for them; she testified that she saw that her brother and defendant were covered in blood. At trial, Jessica Carter and Anthony Carter each testified that defendant told his wife that he and Anthony

---

[5] A trace analyst at the Rhode Island State Crime Laboratory determined that charred debris taken from the scene of the crime tested consistently with the presence of WD-40. WD-40 is an oil-based lubricant.

Carter had killed two women and that the men's bloody clothes had to be put into a bag.[6] The defendant and Anthony Carter showered, and, after stopping by Carter's grandmother's home to retrieve some clothing, they drove to Florida.[7] The defendant's stay in Florida was short-lived: he remained there for only about two weeks. The day after he returned to Rhode Island, defendant explained in detail to Jessica Carter, Anthony's sister, what had occurred, a story that included Sousa's demand for money following the car accident, the manner in which he and Anthony Carter had killed the women, and the fact that they set the women's bodies on fire.

The Providence police, who were investigating the murders, reached defendant on the telephone while he was in Florida, asking him to come to the police station. During a telephone conversation on June 14, 2007, defendant informed a Providence detective that he was in Idaho on his way to California and that he had last seen Sousa and Jesus one week earlier. A different police officer received a call from defendant on June 20, 2007; during that call, defendant claimed to be in Idaho attending to a sick relative while he was actually in Florida with Carter.[8] During the latter conversation, defendant also informed the police that he had last seen the rental car in Massachusetts on June 12 or 13, after he quarreled with Carter. Significantly, Carter's grandmother testified that during the time defendant was hiding in Florida, she was contacted by both defendant and his wife. Each requested that she persuade her grandson to tell police that he

---

[6] The defendant's wife invoked the spousal privilege and did not testify beyond answering the questions necessary to show that the privilege applied.

[7] Later, in his statement to police, defendant said that he and Carter stopped at Carter's grandmother's house first and his own house second. In that statement, defendant also gave his reason for leaving Rhode Island in a rented car in the middle of the night for a two-week stay in Florida: he said that he left because he and his wife were not getting along and that Florida was the destination because he had an uncle who lived there.

[8] According to the officer who spoke to defendant on June 14, defendant claimed that he was driving through Idaho on his way to California. Carter testified that he overheard defendant's half of a conversation with police, during which defendant said that he was in Ohio on his way to California to see a sick uncle. There is no dispute that defendant was in Florida at the time.

and defendant were not together at the time that the murders were committed. On June 29, 2007, after his return from Florida, defendant voluntarily met with Providence police detectives. This time he admitted that he was with Carter on the night of the murders. In defendant's statement to police, which was played for the jury during his trial, he claimed that, on the night of the murders, he waited downstairs on a porch while Carter was in Jesus' apartment.

On appeal before this Court, defendant argues that the trial justice erred when he admitted into evidence testimony about a robbery that he and Carter had committed the day before the murders, that the instruction on the use of that evidence was deficient, and that the trial justice further erred when he refused to declare a mistrial because of prejudicial remarks by the prosecutor during his closing argument.

## II

### Evidence of Robbery

During defendant's trial, Carter, who was presented as a witness by the state, was allowed to testify that he and defendant had committed a robbery on June 13, 2007.[9] Before he admitted evidence about that robbery, the trial justice conducted a sidebar conference, during which he heard argument about whether such evidence was admissible pursuant to Rule 404(b) of the Rhode Island Rules of Evidence. During that conference, the state maintained that the evidence was necessary to avoid creating "a vacuum" in the minds of the jury about what Carter and Clements were doing during the day on June 13 and that such a vacuum "would naturally invite them to speculate what was going on." The state also urged that the evidence should be admissible because defendant had been charged with conspiracy. The defendant objected, relying on State v. Pona, 948 A.2d 941 (R.I. 2008) (Pona I), and State v. Gaspar, 982 A.2d 140

---

[9] The defendant had pleaded nolo contendere to the charges arising out of the robbery.

(R.I. 2009). After listening to both sides, the trial justice said that he would allow the testimony because the robbery was "inextricably woven with the fabric of this story" and because it allowed the state "to establish the personal relationship between" defendant and Carter.

After admitting that he had pleaded guilty to several other robberies, Carter testified over defendant's objection that he also had pleaded guilty to committing a robbery on June 13, 2007, and to conspiring with Clements to commit that robbery. Carter then testified as to the more recent additions to his impressive criminal record, including his pleas to the charges arising from the murders of Sousa and Jesus, as well as other charges arising out of robberies that he had committed after fleeing to Florida. The trial justice then instructed the jury as follows:

> "Ladies and gentlemen, you have just heard an exposition of [Carter's] criminal record that he has pled guilty to various charges, that he spent time in the training school from the time he was 12-years old, and you have heard all of that under the rules of evidence. That is allowed to go before you for one reason and one reason only in a case like this. Any witness who appears in any kind of case who has a criminal record is allowed to have that record exposed to you for one purpose and one purpose only, and that is for you to use this information, if you think it is important, in assisting you among the many other things that you would look at in assessing this witness'[s] credibility as a witness in this particular case and for no other reason, to assess his credibility, if you think it's important in addition to the other instructions that I will give you about the credibility of witnesses generally at the end of this case."

The defendant lodged no objection to this instruction.

Carter's sordid tale continued on the afternoon of the same day of the trial, during which Carter again testified over objection that he committed a robbery with defendant on June 13, 2007. Following a few questions that focused on the murders and a request from defendant's counsel to approach the bench without the stenographer, the trial justice gave the jury another instruction:

"Ladies and gentlemen, you have heard another reference to the witness'[s] testimony about an alleged robbery that was committed by h[im] and the defendant on the 13th of June. I gave you an instruction when you first heard about that in the morning session, if you recall that, about the uses to which that could be put.

"In the first instance, it can only be used against this witness if you think it's important in assessing his credibility with regard to the defendant, Mr. Clements, who is the defendant in this case. That information can be assimilated by you, but it cannot be used by you as to what we call propensity evidence. Therefore, what I mean by that is if you believe that this witness is truthful with regard to what he is saying about that particular event, you may not, therefore, say because the defendant has done that which appears to be an established fact, what has been introduced, he, therefore, must have killed these two women. You cannot make that leap. They're two unconnected activities. So the Court is cautioning you that while that is properly before you, you cannot say, well, if he robbed somebody that afternoon, he, therefore must have killed these two women. That is not appropriate."

As with the instruction earlier in the day, this instruction also did not prompt an objection from defendant.

Finally, during his final charge to the jury, the trial justice imparted another instruction about the evidence of the robbery. The final jury charge included the following:

"Now, in this case, you have heard evidence that on other occasions this defendant may have been involved in other criminal activity or misconduct. The Court has allowed that evidence before you, but the evidence before you cannot be used by you to determine that because he may have done something else that may have either been illegal or inappropriate that, therefore, he must have committed the charges for which he is on trial for today. You may not use that information in that regard at all so we cannot have a propensity or character evidence that says, therefore, if some person does a bad act over here, then they must have done the bad act over here. So you cannot use that information for that purpose at all."

The defendant did not object to this part of the final jury instructions.

On appeal before this Court, defendant contends that the admission of this evidence violated Rule 404(b) and Rule 403 of the Rhode Island Rules of Evidence. He further argues that the trial justice's cautionary instructions were deficient and that the trial justice abused his discretion in denying his motion to pass based on the prosecutor's reference to this evidence during closing argument.

## III

## Admission of the Evidence

### A

### Standard of Review

"[I]t is well settled that we review a trial justice's decision admitting or excluding evidence under an abuse of discretion standard." State v. Pona, 66 A.3d 454, 465 (R.I. 2013) (Pona II) (quoting State v. Brown, 42 A.3d 1239, 1242 (R.I. 2012)). Accordingly, "[w]e will reverse a trial justice's ruling on the admissibility of evidence only where 'it constitutes a clear abuse of discretion.'" Id. (quoting Brown, 42 A.3d at 1242).

### B

### Rule 404(b)

Rule 404(b) provides in pertinent part that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." The prohibition against the introduction of such propensity evidence is undergirded by "the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice." Pona I, 948 A.2d at 949 (quoting State v. Gallagher, 654 A.2d 1206, 1210 (R.I. 1995)).

Nonetheless, Rule 404(b), by its own terms, "permits the admission of 'other crimes' evidence when it is offered to show something apart from 'a probability that [a defendant] has committed the crime on trial because he is a man of criminal character.'" Pona I, 948 A.2d at 949 (quoting State v. Jalette, 119 R.I. 614, 624, 382 A.2d 526, 532 (1978)). The valid purposes for which such evidence may be offered include establishing motive or intent, "prov[ing] a material element of the crime" charged, and introducing such evidence "when crimes are interwoven or in instances when introduction is necessary for 'a trier of fact to hear a complete and, it is to be hoped, coherent story so as to make an accurate determination of guilt or innocence.'" Id. at 949, 950 (quoting State v. Gomes, 690 A.2d 310, 316 (R.I. 1997) and citing Gallagher, 654 A.2d at 1210). We have said that the itemization set forth in Rule 404(b) contains "examples, rather than a complete enumeration, of permitted purposes." State v. Rodriguez, 996 A.2d 145, 150 (R.I. 2010) (citing State v. Lemon, 497 A.2d 713, 720 (R.I. 1985)). Because the trial justice "must balance the relevance of the evidence against its remoteness and the potential for improper prejudicial impact[,]" Pona II, 66 A.3d at 466 (quoting State v. Dubois, 36 A.3d 191, 200 (R.I. 2012)), "[w]hen other crimes evidence is 'prejudicial and irrelevant,' its exclusion obviously is required[.]" Pona I, 948 A.2d at 949 (quoting State v. Martinez, 651 A.2d 1189, 1194 (R.I. 1994)).

In Pona I, 948 A.2d at 949-52, we considered the case of a defendant who was charged with murdering a teenaged girl who was expected to be a witness in a trial for a different murder committed by the same defendant. During the trial for the murder of the witness, the trial justice admitted substantial evidence about the first murder. That evidence included: (1) testimony that the defendant's pager had been found at the scene of the crime; (2) testimony that the defendant's fingerprints had been found on a car that was seen fleeing the area; and (3) the

playing, in its entirety, of the young victim's testimony at the bail hearing for the first murder. Id. at 944-45, 948.

We vacated the conviction and ordered a new trial in that case because we held that the trial justice had committed reversible error when he admitted the pager and fingerprint evidence. Pona I, 948 A.2d at 952, 954. Although the defendant's motive to murder the witness was relevant, "the specific facts of the [earlier] murder * * * ha[d] little, if any, probative value with respect to any conspiracy surrounding [the witness's] murder, except perhaps to demonstrate that [the] defendant was prone to kill." Id. at 950. We further held that playing the entirety of the bail-hearing testimony was excessive. See id. at 953.

After that defendant was retried and again convicted, he appealed a second time, occasioning a second review of the admission of a lesser amount of Rule 404(b) evidence at the retrial. Pona II, 66 A.3d at 465. In Pona II, we affirmed the conviction because the trial justice permitted the admission of that evidence that was necessary to demonstrate the victim's role in the investigation of the first murder, but the trial justice "excluded evidence related solely to the prior murder itself, which had no probative force." Id. at 468.

In this case, the evidence of the daytime robbery had scant relevance to the crimes for which defendant was being tried. Although the state argues that the evidence was necessary to establish the relationship between defendant and his confederate, Anthony Carter, there already had been ample testimony about that relationship, and the evidence of the robbery did not particularly sound on that relationship. See Pona II, 66 A.3d at 468 (approving the exclusion of evidence that related solely to another crime because it "had no probative force"). Carter himself testified that he and defendant practically had grown up together in the training school, and, after he was released from the ACI, he hung out with defendant and even stayed at defendant's home.

- 12 -

Additionally, Jessica Carter testified that she saw her brother and defendant together nearly every day.

The state's argument that the evidence of the robbery was admissible to prove the conspiracy count is equally unpersuasive. The state relies on State v. Chartier, 619 A.2d 1119, 1122-23 (R.I. 1993), in which evidence about one of a series of robberies was admissible to demonstrate a defendant's "knowledge and acceptance of the criminal intent" of his associates in committing two other robberies in the same evening. But here, the robbery at issue was committed many hours before the murders, and nothing in the record appears to suggest that there was any connection whatsoever between that particular robbery and the two grisly murders that occurred early the following morning.

Our conclusion that there was minimal nonpropensity purpose for admitting evidence of the robbery is buttressed by the nature of the testimony about the robbery. That testimony was limited to the fact that the robbery took place, that Carter pleaded guilty to the robbery and conspiracy, and that defendant was involved in both the robbery and the conspiracy to commit it. The questions about those crimes elicited little information that might further illuminate the relationship between defendant and Anthony Carter or suggest that the robbery was somehow connected to the murders, such as the reason for the robbery, the nature of the planning of the robbery, the amount of money obtained, or what happened to that money.

The evidence about the June 13, 2007 robbery is problematical under Rule 404(b). Thus, we must now determine whether, under the facts of this case, the admission of that evidence warrants vacating the convictions.

It is our considered opinion that the mountain of evidence against this defendant leads to the singular conclusion that the evidence of the robbery the day before the murders, admitted

- 13 -

pursuant to Rule 404(b), even if error, was harmless beyond a reasonable doubt. See State v. Bailey, 677 A.2d 407, 410-11 (R.I. 1996); cf. State v. Ciresi, 45 A.3d 1201, 1215 (R.I. 2012). Anthony Carter testified that he and defendant agreed upon their course of action in response to the victims extorting them for money. He also explained in exquisite detail about the murders, including the methods that each of them used to kill the victims and the fact that they decided to burn the bodies in a failed attempt to destroy evidence. The forensic evidence, including the testimony of the medical examiner and the discovery of trace elements of accelerants, confirmed much of Carter's testimony about how the murders took place and the manner of death.

Anthony Carter also informed the jury about the pair's arrival at defendant's home drenched in blood, a fact which Jessica Carter confirmed in her testimony. Both Carters also testified that defendant told his wife about the crimes that he and Anthony Carter had just committed. Additionally, Jessica Carter related to the jury that, after defendant returned from Florida, he explained to her in detail what he and her brother had done and why they had done it. Carter's grandmother also confirmed that she had rented a car for defendant and Carter; her description of that vehicle matched the description of the car seen by a Providence police officer outside Jesus' apartment immediately before the fire was discovered. Carter's grandmother's testimony also disclosed that Clements and his wife each had requested that she tell her grandson to deny that he and defendant were together at the time of the murders. In our opinion, the outcome of this trial would have been the same with or without the jury's learning of the robbery on June 13.

# C

## Rule 403

Rule 403 says that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This rule "cuts across the rules of evidence and is always a consideration in a trial justice's ruling on the admissibility of Rule 404(b) evidence[.]" Pona II, 66 A.3d at 466 (quoting Gaspar, 982 A.2d at 148). Rule 403, however, should prohibit evidence "only when [the] evidence is marginally relevant and enormously prejudicial[.]" Pona II, 66 A.3d at 466 (quoting State v. Smith, 39 A.3d 669, 675 (R.I. 2012)). We have said previously that prejudice may be found when evidence "would inflame the passions of the jury." Smith, 39 A.3d at 676 (citing State v. Rushlow, 32 A.3d 892, 897 (R.I. 2011)). In Smith, 39 A.3d at 676, we declined to find error in a trial justice's allowance of testimony about a defendant's prior weapons training when that testimony was offered to cast light on the reasonableness of a witness's fear of disclosing molestation. In affirming the conviction, we said that the testimony "was not of a type that would inflame the passions of the jury." Id. (citing Rushlow, 32 A.3d at 897).

Here, Rule 403 does not bar the evidence of the robbery because the challenged evidence's dearth of relevance was not accompanied by "enormous[] prejudic[e]." See Pona II, 66 A.3d at 466. Clearly, the evidence of the murders that was placed before the jury was so heinous and grotesque that evidence that defendant had committed a robbery on the previous day could not serve to "inflame the passions of the jury." See Smith, 39 A.3d at 676.

# D

## Cautionary Instructions

This Court frequently has stated that when Rule 404(b) evidence is admitted "the trial justice must instruct the jury on the limited purpose for which the evidence may be considered." State v. Robinson, 989 A.2d 965, 980 (R.I. 2010) (quoting State v. Merida, 960 A.2d 228, 239 (R.I. 2008)). However, "[i]t is well established that 'the raise-or-waive rule precludes a litigant from arguing an issue on appeal that has not been articulated at trial.'" Ciresi, 45 A.3d at 1212 (quoting State v. Brown, 9 A.3d 1240, 1245 (R.I. 2010)).

In the case presently before us, defendant contends that the trial justice's instructions regarding the use of the robbery evidence do not pass muster. Specifically, defendant argues that the instructions failed to inform the jury of the permitted uses of the evidence and explained only that the panel was forbidden to use the evidence to find defendant guilty based on his commission of the robbery. Significant to our consideration, however, each time the trial justice imparted the instructions that defendant now claims were deficient, defendant failed to object. We hold, therefore, that defendant failed to preserve his objections to the content of the limiting instructions given to the jury.

# IV

## Motion to Pass

During the state's closing argument, the prosecutor referred to the robbery evidence and informed the jury that, in his statement to police, defendant had admitted to committing the robbery and to conspiring to commit it. Specifically, the prosecutor argued that defendant's statement to police was totally unworthy of belief, summarizing defendant's statement to the police as follows: "Yeah, I was in that car. Yes, I was driving. Yes, I was with Anthony, same

guy, I was with him hours before I committed that robbery and conspired with him to rob these two people, same guy." After the state's closing argument ended, defendant moved to pass the case, arguing that there had been no reference to the robbery in defendant's statement to police. The trial justice denied the motion, explaining that he would again tell the jury that it should not use the evidence of the robbery, for which defendant was not on trial, to find defendant guilty of the crimes with which he was charged.

## A

## Standard of Review

"We review a trial justice's decision on a motion to pass a case for abuse of discretion." State v. Truesdale, 787 A.2d 1172, 1177 (R.I. 2001) (citing State v. Gardiner, 636 A.2d 710, 717 (R.I. 1994)). The trial justice's "'front-row seat' at the trial" provides him or her with the ability to "best determine the effect of the improvident remarks upon the jury." Id. (quoting State v. Figueroa, 673 A.2d 1084, 1091 (R.I. 1996)). "Therefore, the refusal of the trial justice to pass a case is accorded great deference and will not be disturbed on appeal unless it is shown to be clearly wrong." Id.

## B

## Discussion

"A prosecutor is given considerable latitude in closing argument, as long as the statements pertain only to the evidence presented and represent reasonable inferences from the record." State v. Boillard, 789 A.2d 881, 885 (R.I. 2002) (citing State v. Scott, 114 R.I. 132, 137, 330 A.2d 66, 70 (1974)). "[W]hile there is no formula in law which precisely delineates the proper bounds of a prosecutor's argument, * * * prejudice obviously inheres if the remarks are totally extraneous to the issues in the case and tend to inflame and arouse the passions of the

- 17 -

jury." Id. (quoting State v. Mancini, 108 R.I. 261, 273-74, 274 A.2d 742, 748 (1971)). "The probable effect of the prosecutorial statements on the outcome of the case must be evaluated by examining the remarks in the context in which they were made." Id. (citing State v. Brown, 522 A.2d 208, 211 (R.I. 1987)).

In Boillard, 789 A.2d at 884-86, we affirmed a trial justice's denial of a motion to pass. There, a prosecutor suggested that a defense witness's denial that the charged conduct had taken place possibly resulted from repressed memories, and he explained that inconsistencies exposed during cross-examination of state child witnesses were caused by the witnesses' exhaustion and desire to agree to anything to end the cross-examination. Id. at 884-85. We said that the "explanations * * * , though conjectural, were within the array of reasonable inferences that could be drawn from the facts presented at trial, and they were neither extraneous nor inflammatory." Id. at 886. In declining to reverse based on the prosecutor's comments, we also relied on the trial justice's instruction to the jury that closing arguments are not evidence. Id.

Here, we cannot say that the trial justice abused his discretion in denying the motion to pass. The prosecutor's closing argument misstated that the defendant had admitted in his statement to police that he had committed the June 13, 2007 robbery. That comment was made as the prosecutor attempted to convey the inconceivability of the defendant's version of the facts, in which he claimed that he had been present at Jesus' building during the killings but remained outside on the porch while Carter murdered both Jesus and Sousa. See Boillard, 789 A.2d at 886. The believability of the defendant's story was certainly a proper subject of closing argument, and, in the context of assailing that story, the prosecutor was simply recounting that the defendant had admitted doing many things with Anthony Carter while emphasizing that the one thing that the defendant denied doing with Carter was entering Jesus' apartment and

committing these murders. The trial justice instructed the jury that closing arguments were not evidence, and the prosecutor referred to a crime about which the jury already had heard testimony that was not so prejudicial as to violate Rule 403. Thus, although the defendant had not admitted to police that he participated in the robbery, the prosecutor's comment in these circumstances was not likely to "inflame and arouse the passions of the jury." See Boillard, 789 A.2d at 885-86 (quoting Mancini, 108 R.I. at 273-74, 274 A.2d at 748). The trial justice therefore did not err when he denied the motion to pass the case.

## V

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court. We remand the record to that tribunal.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**      State v. Raymond Clements.

**CASE NO:**      No. 2011-203-C.A.
            (P1/09-615A)

**COURT:**      Supreme Court

**DATE OPINION FILED:**      February 3, 2014

**JUSTICES:**      Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**      Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**      Providence County Superior Court

**JUDGE FROM LOWER COURT**:

      Associate Justice Francis J. Darigan, Jr.

**ATTORNEYS ON APPEAL:**

      For State:   Jane M. McSoley
                   Department of Attorney General

      For Defendant:  Richard K. Corley, Esq.