**Supreme Court**

No. 2013-282-C.A.
(P1/12-3387AG)

State                              :

v.                              :

Michael Tully, a.k.a. Michael Vanover.          :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                 :

v.                                   :

Michael Tully, a.k.a. Michael Vanover.    :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** On May 30, 2012, at approximately 11:05 p.m., twenty-six-year-old Ralph Joseph was struck by a single bullet as he fled from a building located at 51 Salmon Street in the City of Providence. The bullet pierced his skull and caused his death two days later. The scene that unfolded before Joseph exited the building, as well as the events that led to this fateful occasion, are unclear. The evidence suggested a drug-deal-turned-murder, involving Joseph, Michael Tully (defendant),[1] Leshayna Owens, Ryan Rue, and at least one other unidentified individual. After a jury trial in Superior Court, the defendant was convicted of first-degree felony murder and conspiracy to commit robbery. He appeals from this verdict as well as from the denial of his motion for a new trial. For the reasons set forth below, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

In December 2012, a grand jury returned an indictment containing six felony charges against defendant: the murder of Ralph Joseph, in violation of G.L. 1956 §§ 11-23-1 and 11-23-2

---

[1] The record of this case reveals that defendant was known by various aliases. The defendant's name at birth, according to his birth certificate, was "Negomeh Mike Kpaingbay Tully." We shall refer to him as "defendant."

(count 1); discharging a firearm in the commission of a crime of violence (murder), resulting in the death of Ralph Joseph, in violation of G.L. 1956 § 11-47-3.2(b)(3)[2] (count 2); the assault of Ralph Joseph with intent to commit robbery, in violation of G.L. 1956 § 11-5-1 (count 3); the first-degree robbery of Leshayna Owens, in violation of G.L. 1956 § 11-39-1(a) (count 4); conspiracy to commit robbery, in violation of G.L. 1956 § 11-1-6 (count 5); and carrying a firearm without a license, in violation of § 11-47-8(a) (count 6).

At trial, the state presented twelve witnesses in its case against defendant, including lengthy testimony by Leshayna Owens. Owens, who was present during the shooting and was a mutual acquaintance of both defendant and Joseph, provided key portions of the narrative regarding defendant's involvement in Joseph's death.

Owens testified that she had met defendant approximately six or seven months before the date of the shooting. During this period of time, Owens would "[h]ang out" and "[s]moke marijuana" with defendant a few times per week, and she sometimes would see him around the neighborhood. This neighborhood was the "Manton" area of the City of Providence, which is near the Manton Housing Development, referred to as the "Manton projects." Owens recalled that she had purchased marijuana from defendant "[t]wo or three times." She identified defendant at trial and described him as "[d]ark skin, shorter than [her,[3]] [c]ross-eyed," with a "[m]uscular, but skinny" build.

Owens testified that she had met Joseph at a party in late May 2012, approximately one week before the shooting. She "[h]ung out with him a few times" during this final week of his

---

[2] It appears that this subsection was supposed to be G.L. 1956 § 11-47-3.2(b)(2) (discharging a firearm resulting in the injury of a person other than an on-duty police officer), rather than § 11-47-3.2(b)(3) (discharging a firearm resulting in the injury of an on-duty police officer). This charge was described on the verdict form as "discharging a firearm during a crime of violence causing the death of Ralph Joseph." Joseph was not a police officer.
[3] Owens testified that she was six feet, three inches tall.

life; she sold him small amounts of marijuana, and they spent time smoking together. Joseph also introduced Owens to his friend Ryan Rue.

According to Owens, Joseph called her in the early afternoon of May 30, 2012 and asked her to purchase one pound of marijuana for him. Owens agreed to take Joseph to a location to make the purchase; and, in exchange, she would receive some of the marijuana and some money. Owens then made phone calls to various contacts who could potentially provide them with the marijuana. One of those contacts was defendant. Owens told defendant that she was looking for one pound of marijuana for an unidentified friend, and the two agreed to a price of $1,100. Later in the day, Owens informed Joseph of the arrangement, and then Joseph and Rue came to Owens's house, where the three smoked marijuana before leaving to make the purchase from defendant. Records extracted from Owens's cell phone indicated that, between 9:31 p.m. and 10:57 p.m., Owens made seven outgoing calls to defendant's cell phone, and he called her three times. Owens testified that defendant arranged for the sale to take place in a building located on Salmon Street in the Manton projects, not far from where Owens lived.

The evidence in this case included surveillance video footage of a walkway behind 60 Fairfield Street, which was located a short distance from the building on Salmon Street where the sale was to take place. This video showed a man standing and walking on the walkway while speaking on a cell phone, at approximately 10:47 p.m. on May 30, 2012. The man was wearing a black hooded sweatshirt with the hood down, a black hat, and jeans. At trial, a patrolman of the Providence Police Department identified this man as defendant. After a few minutes, a second man entered the scene, wearing a black T-shirt and jeans. The two men then exited the right-hand side of the screen, in the direction of the building located at 60 Fairfield Street. A few minutes later, the two men re-entered the screen, this time both wearing dark sweatshirts; the

- 3 -

video showed them walking side by side through the camera's vantage point and exiting to the top of the screen, in a direction leading to Salmon Street.

Shortly before 10:45 p.m., Owens, Joseph, and Rue drove in Rue's silver BMW convertible to the area where defendant had instructed them to meet. They circled this area for a few minutes while looking for the correct building, which Owens thought was number 52 Salmon Street but turned out to be number 51.[4] After parking in front of 51 Salmon Street, the three waited for a few minutes in the car. Owens testified that she saw "about one or two guys" go inside the front door of the building, neither of whom she recognized. She then observed defendant standing in the doorway and holding up one finger, signaling that she and Joseph should wait before going inside. According to Owens, defendant was wearing jeans and a black hooded sweatshirt, with the hood pulled down, and his face was uncovered.[5] After signaling to Owens to wait, defendant went inside the building.

One or two minutes later, Owens saw a man put his head out of a window on the second floor of the building, and he waved at her with his hands and verbally instructed her to come upstairs. When asked at trial, Owens stated that she was unsure whether this person was defendant.[6] According to Rue, Owens was waiting for a phone call, and she and Joseph left the vehicle after receiving this call. Owens and Joseph then departed from Rue's car and walked inside the building located at 51 Salmon Street. Surveillance video footage confirmed that two individuals entered through the front door of 51 Salmon Street at 11:05 p.m.; approximately

---

[4] Surveillance video of an area outside 51 Salmon Street confirmed that a silver convertible drove by the building multiple times between 10:55 p.m. and 10:59 p.m.

[5] Rue also testified that he saw a man in the doorway, whom he described as "black" and "wearing a doo rag," with nothing covering his face. Surveillance video showed a figure in the doorway of 51 Salmon Street at 11:01 p.m., but the image was not clear enough to distinguish clothing or features.

[6] When asked during the grand jury proceedings, Owens testified: "I can't tell who it was, but I know it wasn't [defendant]."

thirty seconds later, one of these individuals exited the building and fell, face first, to the sidewalk from a short flight of stairs outside the front door. An unidentifiable figure appeared briefly in the doorway as the injured person fell.

Owens was the only witness who testified at trial regarding the events that occurred inside 51 Salmon Street at 11:05 p.m. Thus, her testimony and her credibility were crucial pieces of the state's case. Owens testified that, after she and Joseph entered the building, she heard a voice instructing them to come upstairs.[7] They walked up the stairs, Owens following Joseph; when Owens reached the landing at the top of the stairs, she was accosted by a man who pointed a gun at her. Owens described this man as "Spanish and chunky."[8] Owens recalled that he was wearing a hooded sweatshirt with the hood pulled up, that he wore his hair in a ponytail, and that he wore a black mask that covered his face from nose to chin. Owens testified that, as she was being confronted, she saw Joseph turn around and run past her in the direction of the stairs, pursued by another man. Owens described the man chasing Joseph as "[b]lack," with "dark skin," "[s]kinny," and shorter than herself. He was wearing jeans, a black hooded sweatshirt with the hood pulled up, and a mask. Owens testified that she was "screaming frantically," with her back against the wall at the top of the stairs, and the man holding her at gunpoint was standing in front of her, yelling "[s]hut the fuck up."

Owens testified that, as this chaotic scene unfolded, she saw Joseph run past her, fall down the stairs, get up, and run out of the door from which they had entered the building. She saw the second man pursue Joseph down the stairs; and, when he reached the doorway, Owens heard him call out to Joseph, "[d]on't run, don't run." Owens testified that she recognized this

---

[7] The front entrance to 51 Salmon Street consisted of a short, outdoor stairway leading to a front door, directly inside of which was an indoor stairwell leading to the building's second floor.

[8] When asked to define "Spanish," Owens replied, "Lighter than my complexion."

voice as belonging to defendant. She further testified that she saw the man's face from the eyes up[9] and became aware "that [she] knew him." She also claimed that she recognized him from "[h]is body type" and "[t]he way he walked." Seconds after hearing this man instruct Joseph not to run, Owens saw the man raise his arm, and she heard a gunshot. Owens recalled witnessing this event from the landing at the top of the stairs where she was being detained; she was looking to her right, down the stairs, at the shooter's back.

Owens testified that, after the gunshot, the man holding her at gunpoint grabbed her purse from her hands and ran down the stairs, and the two men exited the building through a back door. Owens remained in place for "a minute or two" out of fear, and she then ran out of the building through the front door. Upon exiting the building, she saw Joseph on the ground outside of the doorway, "bleeding and coughing." Owens testified that she gestured to Rue—who was still in the car—for help, "pointing to [Joseph] and pointing to [Rue]."[10] According to Owens, Rue did not respond; instead he drove slowly away. Owens then fled from the scene on foot, running through the projects to a nearby gas station. She called her brother as she escaped, and he picked her up at the gas station and took her home.[11] When asked at trial, Owens testified that she had not known, before arriving at 51 Salmon Street, that defendant and another man were going to rob Joseph and her, nor had she known that defendant would have a gun.

Rue, who waited in the car while Joseph and Owens went inside the building, testified that he saw Joseph exit the building, heard a gunshot, and saw Joseph fall to the ground. Rue

_____

[9] This testimony was the impetus for defendant's motion to pass the case, discussed infra.

[10] Rue was hearing-impaired but wore a cochlear implant.

[11] Although she had been robbed of her pocketbook, Owens remained in possession of her license and her phone; she had arrived at 51 Salmon Street with her license in her back pocket and her phone inside her bra.

- 6 -

testified that, after he saw Joseph fall, he "took off" and did not see Owens exit the building.[12] After a resident of 51 Salmon Street called 911, Joseph was taken by ambulance to Rhode Island Hospital. One of the first responders found $1,300 on Joseph's person; the money was turned over to personnel at the hospital.

Owens testified that she spoke with defendant on the phone approximately twenty to thirty minutes after the shooting, and she "asked him why he did what he did." In response, defendant told Owens that "he was only trying to scare him," meaning Joseph. According to Owens, defendant did not know, until she informed him, that Joseph had been hit with the bullet. Records extracted from Owens's cell phone confirmed that she made two outgoing calls to defendant after the shooting, at 11:17 p.m. and 11:21 p.m.

Then, approximately one hour after the shooting, Owens received a text message from defendant, which read: "You heard bout em HP kids busten in manton"; Owens explained that "HP kids" referred to the Hartford projects, which are near the Manton projects. Owens interpreted this text message "as a way of * * * telling [her] to be quiet and basically blame [the shooting] on them, the Hartford project kids." She testified that, although she knew it was a lie, she responded by telling defendant that she had not heard anything about it and did not know what had happened.

The day after the shooting, Owens gave a recorded statement to the police, which she later recanted in part. She told the interviewing officers that she had been involved in a prearranged drug transaction, but she identified the intended seller as a person called "G," with

---

[12] Surveillance video footage confirmed that the silver convertible drove off after Joseph fell; an individual, presumably Owens, can then be seen exiting the building and disappearing from the screen.

whom, she said, she was not acquainted.[13]  She mentioned a "dark-skinned" man who signaled from 51 Salmon Street that she and Joseph should come inside, and she indicated that this man was the same person who shot Joseph, but she did not identify this person as defendant or reveal that she knew who he was.  At trial, she explained that she had not wanted to identify defendant at that time "because [she] [didn't] want to get hurt and [she] [didn't] want [her] family to get hurt."

Two days after the shooting, Owens saw defendant at a local convenience store.  She testified that she approached defendant and asked why he had done what he had done, told him that she did not want to get hurt and "didn't want to be involved," and that the police had already come to her house and she had told them that she "didn't know anything."  Owens also told defendant that she had "found out that [Joseph] was on life support"; according to Owens, defendant responded by saying that they "would be all set because [Joseph] was the only person there to testify or anything like that."  Owens testified that she was concerned about the safety of herself and her family, because she had been present during the shooting.  The defendant told her that she and her children would be safe, and that she should "[j]ust stick to [her] story," the story being that "she didn't know anything."  At the end of this encounter, Owens cried and hugged defendant, purportedly because she was scared and she "wanted to make sure * * * that he knew [she] was on his side."

---

[13] Owens explained at trial that "G" was a nickname for an individual named Marcus Hughes, whom Owens knew, and who was incarcerated at the time of the shooting.

Joseph passed away two days after the shooting, on June 1, 2012. The autopsy report revealed that the cause of death was a single perforating gunshot wound through the head; the manner of death was ruled a homicide.[14]

Owens was again interviewed by the police on June 4, 2012. She was shown three photo arrays, in one of which she identified defendant as a person whom she knew. When asked if anyone from the photo arrays was involved in the robbery on May 30, 2012, Owens told the interviewing officers, for the first time, that defendant had been involved and that he had been the shooter. Owens told the officers that she had not expected defendant to be present during the drug transaction, that he was wearing a mask, and that she had identified him by his voice. One of the interviewing officers testified that Owens was crying during this interview; when he asked why she was crying, she responded that "[s]he felt that her life was in danger, her family's life was in danger and that she would have to leave - - move out of the area."

In November 2012, Owens entered into a cooperation agreement with the state, in which the state agreed, in exchange for Owens's truthful testimony from that point forward, to not charge her for any drug offense relating to the planned transaction on the night of the shooting, or for any false statements made to the police prior to the date of the agreement. In March 2013, Owens and the state executed a second agreement, in which the state additionally agreed to not charge her for conspiracy or felony murder.

The defendant was tried by jury in Superior Court for five days in March and April of 2013. At the close of the evidence, the state dismissed count three of the indictment (assault with intent to commit robbery). The jury considered the remaining five counts and delivered a verdict on April 1, 2013. The jury found defendant guilty of two counts only: the first-degree

---

[14] Although the bullet passed completely through Joseph's skull, no projectile was found in the vicinity of the crime scene, only a 9 millimeter shell casing.

felony murder of Joseph, and conspiracy to commit robbery. The defendant was acquitted of the remaining charges: discharging a firearm during a crime of violence (murder), carrying a firearm without a license, and first-degree robbery of Owens. The defendant moved for a new trial on April 4, 2013, on the grounds that the verdict was against the law, the evidence, and the weight of the evidence. A hearing was held on April 18, 2013, and the trial justice issued a bench decision denying defendant's motion on the same day. The defendant was sentenced to serve life in prison for count 1 and ten years in prison for count 5, to be served concurrently, as well as twenty years in prison for being a habitual offender, to be served consecutively to the sentence for count 1. Judgment was entered on June 20, 2013, and defendant filed a timely notice of appeal.

## II

### Discussion

### A

### The Defendant's Motion to Pass the Case

At trial, after the prosecution elicited from Owens a basic chronology of the events leading up to and during the shooting, the court took a brief recess. Upon return, the prosecutor initiated the following line of questioning:

> "Q    Now, just going back to when you were inside of 51 Salmon Street. Were you able to see any part of the Defendant's face at all?
> "A    Yes.
> "Q    What part of his face were you able to see?
> "A    The front of his face.
> "Q    Was anything covering his face?
> "A    A mask.
> "Q    So what part could you see that wasn't a mask?
> "A    From the eyes above.
> "Q    And did you recognize anything about his eyes and above?
> "A    Just that I knew him."

At this point, defense counsel requested a sidebar and moved to pass the case, on the grounds that Owens's facial recognition of defendant was "not in discovery." The following dialogue ensued:

> "THE COURT: Well, she said he had a mask on.
> "[DEFENSE COUNSEL]: Correct. She said she recognizes his face with his mask up.
> "THE COURT: She says - -
> "[DEFENSE COUNSEL]: It's not in discovery.
> "THE COURT: She hasn't said how she recognized him other than she's already testified about the voice. She's testified about his crossed eye, which is visible to anybody in this courtroom. We can see that he's got a situation with his eyes. That's clear.
> "[DEFENSE COUNSEL]: That's my - - that's - - but that is part of our defense. That's not in the discovery, that she recognized him in that building from his cross-eyes. That's not there.
> "THE COURT: I'll hear from you.
> "[PROSECUTOR]: She was never asked about that in Grand Jury. I think she'll probably be impeached with the fact that she recognized - - that she recognized him by his voice. I think it's a fair question. I actually asked her for the first time at trial about what part of his face she could see. I mean, she testified there's a mask, so I think it's an appropriate question to ask.
> "THE COURT: The motion is denied."

On appeal, defendant argues that the trial justice erred in denying his motion to pass the case. The defendant views this matter as a discovery violation pursuant to Rule 16 of the Superior Court Rules of Criminal Procedure. The defendant contends that Owens's trial testimony regarding her visual identification of defendant "was inculpatory and, therefore, should have been clearly and directly disclosed under Rule 16(a)(8)."[15] The defendant explains

---

[15] Rule 16(a)(8) of the Superior Court Rules of Criminal Procedure provides:
> "(a) <u>Discovery by Defendant</u>. Upon written request by a defendant, the attorney for the State shall permit the defendant to inspect or listen to and copy or photograph any of the following items within the possession, custody, or control of the State, the existence of

that, "because [defendant] has distinctively crossed eyes * * *, a significant aspect of the defense strategy was to undermine Ms. Owens's voice identification by establishing the lack of a visual identification, given that Ms. Owens had seen the perpetrator's eyes, which were exposed between his mask and his hood * * *." According to defendant, "the damage of the mid-trial disclosure had the effect of eviscerating defense counsel's ability to undermine Ms. Owens'[s] identification testimony." The defendant maintains that a mistrial was the appropriate remedy for the prejudice to defendant's case caused by Owens's unexpected disclosure.

The state, for its part, argues that this was not a discovery violation, but merely a situation in which a witness's testimony at trial differed from or expanded upon her grand jury testimony. The prosecutor stated at trial that he had not previously questioned Owens regarding the part of defendant's face she had seen; thus, even he did not know, when he asked the question, that she would testify that she had seen and recognized defendant's face from the eyes up.

### 1. Standard of Review

It is well established that "a trial justice's decision on a motion to pass the case is addressed to the sound discretion of the trial justice, and this Court will not disturb the ruling on such a motion absent an abuse of discretion." State v. Cipriano, 21 A.3d 408, 428 (R.I. 2011) (quoting State v. Gautier, 950 A.2d 400, 417 (R.I. 2008)). We give great deference to the trial

which is known, or by the exercise of due diligence may become known to the attorney for the State:
"* * *
"(8) as to those persons whom the State expects to call as witnesses at the trial, all relevant recorded testimony before a grand jury of such persons and all written or recorded verbatim statements, signed or unsigned, of such persons and, if no such testimony or statement of a witness is in the possession of the State, a summary of the testimony such person is expected to give at the trial[.]"

- 12 -

justice in this regard because he or she "has a front-row seat at the trial and is in the best position to determine whether a defendant has been unfairly prejudiced." State v. Oliveira, 882 A.2d 1097, 1127 (R.I. 2005) (quoting State v. Luciano, 739 A.2d 222, 228 (R.I. 1999)).

## 2. Discussion

Although defendant has framed this issue as one of insufficient disclosure, we are convinced that Rule 16 is not implicated. The defendant was provided, in response to his requests for discovery and inspection, with Owens's witness statements made to the police, as well as a transcript of her grand jury testimony, and the state indicated that she was expected to testify consistently with these documents. In her grand jury testimony, Owens stated that she recognized defendant's voice when he said "don't run, don't run," and that "[t]he only reason [she] knew it was him [was] those two words." The prosecutor at the grand jury proceeding did not specifically ask what part of defendant's face, if any, she had seen; however, Owens did state that the man she identified as defendant was wearing a face mask, which would indicate that she had observed some part of his face. Although Owens's grand jury testimony differed to some degree from her statements at trial, when she said explicitly that she had seen and recognized defendant's face from the eyes up, there is no indication that the state was aware of this information and withheld it from defendant. This inconsistency, as well as any other inconsistencies between Owens's trial testimony and her previous statements, merely provided defense counsel with fodder for impeachment upon cross-examination.[16] Accordingly, the trial justice did not abuse his discretion in denying defendant's motion to pass the case.

---

[16] Indeed, Owens's identification of defendant as the shooter was apparently rejected by the jury, as he was acquitted of the charges of possessing and discharging a firearm.

**B**

**The Defendant's Motion for a New Trial**

The defendant asserts that there is only one "reasonably-proven view of the facts of this case": defendant conspired with Owens to sell marijuana to Joseph, and then when Owens, Rue, and Joseph arrived at 51 Salmon Street to conduct the transaction, two other unidentified men happened upon the scene and decided to rob them, and one of these unidentified men shot Joseph as he attempted to flee. The defendant argues that the vast majority of the state's evidence supports this construction of the facts. According to defendant, the jury's apparent rejection of Owens's testimony regarding defendant having possessed and discharged a firearm leads to the conclusion that defendant could not have committed felony murder. Additionally, defendant asserts that "there [was] a gaping lack of evidence" to support the theory that defendant was vicariously liable for murder as a co-conspirator to the robbery.

In response, the state points to Owens's testimony regarding defendant's incriminating statements made after the incident, testimony that the trial justice credited when ruling on the motion for a new trial. Additionally, the state notes that portions of Owens's testimony were corroborated by cell-phone records and surveillance videotape footage.

**1. Standard of Review**

It is well established that, "[w]hen deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." State v. Watkins, 92 A.3d 172, 191 (R.I. 2014) (quoting State v. Clay, 79 A.3d 832, 841 (R.I. 2013)). "In so deciding, 'the trial justice must consider the evidence in light of the jury charge, then independently assess the credibility of the witnesses and the weight of the evidence, and also ultimately determine whether he or she would have reached

a result different from that reached by the jury.'" Id. (quoting Clay, 79 A.3d at 841-42). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." Id. (quoting Clay, 79 A.3d at 842). "Only when the trial justice does not agree with the jury's verdict, [must he or she] embark on a fourth analytical step." Id. (quoting Clay, 79 A.3d at 842). The fourth step of the analysis requires the trial justice to "determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice. If the verdict meets this standard, then a new trial may be granted." State v. Guerra, 12 A.3d 759, 765-66 (R.I. 2011) (quoting State v. Rivera, 839 A.2d 497, 503 (R.I. 2003)).

"Because a trial justice, when deciding a motion for a new trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses, on appeal, this Court's review is deferential." Watkins, 92 A.3d at 191 (quoting Clay, 79 A.3d at 842). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." Id. (quoting Clay, 79 A.3d at 842).

### 2. Discussion

Here, the trial justice articulated the proper standard for deciding a new-trial motion and adequately addressed each step of the analysis in his bench decision. Regarding the "split verdicts" in this case, the trial justice noted that the law does not require consistency in verdicts, and that the outcome in this case was legally sound. He noted that, regarding the charge of robbery of Owens, the jurors may have decided to compromise "and give the defendant the benefit of the doubt," or they may have found that the state did not meet its burden of proof in

- 15 -

showing that Owens was robbed of her purse. Similarly, the trial justice found that the jury could have discredited the portions of Owens's testimony that identified defendant as the shooter; "[t]hat does not mean, however, that the jury's verdict convicting him of conspiracy and felony murder is fatally flawed." The trial justice also noted that the jury could have found defendant guilty of felony murder as a vicariously liable co-conspirator. We agree with the trial justice's analysis in this regard.

This Court follows the rule that "[c]onsistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment." State v. Allessio, 762 A.2d 1190, 1191 (R.I. 2000) (quoting Dunn v. United States, 284 U.S. 390, 393 (1932)). "Thus, we afford juries the power to arrive at inconsistent verdicts of acquittal and conviction for different counts in the indictment, understanding that the jury may reach compromises through a variety of motivations, including leniency." Id. "Because a jury has broad power to compromise, 'this Court will uphold logically inconsistent jury verdicts provided that the verdicts are legally consistent.'" State v. Whitaker, 79 A.3d 795, 805 (R.I. 2013) (quoting State v. Arroyo, 844 A.2d 163, 171 (R.I. 2004)).

We have previously explained that "legal inconsistency exists where 'the essential elements of the count[s] of which the defendant is acquitted are identical and necessary to prove the count of which the defendant is convicted.'" Whitaker, 79 A.3d at 806 (quoting Arroyo, 844 A.2d at 171). "Logically inconsistent verdicts, on the other hand, have been defined as verdicts that 'acquit and convict a defendant of crimes composed of different elements, but arising out of the same set of facts.'" Arroyo, 844 A.2d at 171 (quoting People v. Rhoden, 702 N.E.2d 209, 213 (Ill. App. Ct. 1998)).

The verdicts in the instant case were legally consistent. The charge of first-degree felony murder required that the state prove beyond a reasonable doubt "all the elements of the underlying felony, or an attempt to commit the underlying felony, and that the death occurred during the perpetration of the felony * * * ." Oliveira, 882 A.2d at 1111. "The theory of felony murder is that a defendant does not have to have intended to kill one who dies during the course of certain statutorily enumerated felonies * * * in order to be charged with murder." Id. (quoting State v. Stewart, 663 A.2d 912, 920 (R.I. 1995)). We have explained that "[t]he intent to commit the underlying felony will be imputed to the homicide, and a defendant may thus be charged with murder on the basis of the intent to commit the underlying felony." Id. (quoting Stewart, 663 A.2d at 920).

Robbery, which was the underlying felony in this case, "consists of the 'felonious and forcible taking from the person of another of goods or money [of] any value by violence or [by] putting [the victim] in fear.'"[17] State v. Day, 925 A.2d 962, 978 (R.I. 2007) (quoting State v. Briggs, 787 A.2d 479, 487 (R.I. 2001)). Although the jury acquitted defendant of the first-degree robbery of Owens, this result did not preclude the finding of felony murder regarding Joseph, because the underlying felony for that crime was the attempted robbery of Joseph himself, not Owens. Furthermore, neither felony murder nor attempted robbery require, as essential elements, possession or use of a firearm. Thus, the verdicts in this case were legally consistent.

---

[17] "Although Rhode Island has a statute that sets forth the penalties for the crime of robbery (G.L. 1956 § 11-39-1), the elements of that crime are not defined in that statute." State v. Day, 925 A.2d 962, 978 n.24 (R.I. 2007). As we have previously explained, in this state "the elements of the offense of robbery are the same as at common law." Id. at 977-78.

The verdicts may or may not have been logically consistent. On the one hand, the jurors may have credited Owens's testimony identifying defendant as the shooter with regard to the felony murder charge, but they may have compromised by acquitting him of the charges of possessing and discharging a firearm. This result would be logically inconsistent because these three crimes arose from the same set of alleged facts; namely, that defendant fired a gun at Joseph while attempting to rob him.

An alternative conception of the verdicts in this case—and one in which they are logically consistent—is that defendant was found guilty of felony murder on a theory of vicarious liability. Under this theory, the jurors would have found that defendant was not holding a gun, and that he was not the individual who shot Joseph, as evidenced by their verdicts of not guilty on the counts of carrying a firearm without a license and discharging a firearm in the commission of a crime of violence. The jurors could have found, however, that defendant took part in a conspiracy to rob Joseph, and that, during this attempted robbery, Joseph was killed.

This Court has long recognized the vicarious liability of co-conspirators for acts committed in the execution of the conspiratorial scheme:

> "The rule is well established that where several persons combine or conspire to commit an unlawful act, * * * each is criminally responsible for the acts of his associates or confederates in the furtherance of any prosecution of the common design for which they combine. Each is responsible for everything done by one or all of his confederates, in the execution of the common design, as one of its probable and natural consequences, even though the act was not a part of the original design or plan, or was even forbidden by one or more of them." State v. Barton, 424 A.2d 1033, 1038 (R.I. 1981) (quoting State v. Miller, 52 R.I. 440, 445-46, 161 A. 222, 225 (1932)).

Thus, the jury could have found defendant guilty of felony murder on the theory of vicarious liability stemming from his participation in a conspiracy to rob Joseph. Such a theory would not require the jury to have found that defendant was the person who committed the attempted robbery of Joseph, or that he possessed or discharged the gun.

The theory of vicarious liability does, however, depend on the jury's finding that defendant was guilty of conspiracy. As we have previously explained, "[t]he crime of conspiracy is an agreement between 'two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose.'" State v. Ros, 973 A.2d 1148, 1163 (R.I. 2009) (quoting State v. Graham, 941 A.2d 848, 863 (R.I. 2008)). "Once an agreement has been made, no further action in furtherance of the conspiracy is necessary to find a defendant guilty of the crime of conspiracy." State v. Disla, 874 A.2d 190, 197 (R.I. 2005) (quoting State v. Lassiter, 836 A.2d 1096, 1104 (R.I. 2003)).

This Court has recognized that, "[a]lthough a common agreement is the keystone of the crime of conspiracy, * * * 'it is usually very difficult to prove in complete detail the explicit terms of an agreement.'" Ros, 973 A.2d at 1163 (quoting State v. Oliveira, 774 A.2d 893, 919 (R.I. 2001)). "Consequently, the conspirators' goals may be inferentially established by proof of the relations, conduct, circumstances, and actions of the parties." Id. (quoting State v. Barton, 427 A.2d 1311, 1313 (R.I. 1981)).

In the instant case, the trial justice agreed with the jury's verdict for the conspiracy charge. He explained at the outset:

> "I'm absolutely convinced [defendant] was criminally involved in this event. Call it a drug rip-off, to use the vernacular. There's no question in my mind that he was instrumental at the very beginning in setting up Ralph Joseph. Leshayna Owens adamantly denied being part of the set-up or rip-off; whether she was or wasn't does

> not alter my firm belief that this defendant * * * was intent on stealing Ralph Joseph's money."

The trial justice found that there was sufficient circumstantial evidence to support this verdict, including: the surveillance video footage of defendant behind 60 Fairfield Street; the records of defendant's numerous cellular communications with Owens shortly after the shooting; and the text message in which defendant apparently tried to shift the blame for the shooting to individuals from the "Hartford projects." The trial justice credited Owens's testimony regarding defendant's statement that he "was just trying to scare" Joseph, as well as his statement that he was relieved to hear of Joseph's dire medical condition. The trial justice further credited Owens's testimony that "she felt intimidated by the defendant when he directed her to stick to her story."

Although the identities of the defendant's co-conspirators were not established, and the evidence apparently accepted by the jury was circumstantial in nature, we are convinced that the trial justice was not clearly wrong in finding that the defendant conspired to rob Joseph. The defendant was undisputedly present at 51 Salmon Street immediately prior to the shooting, for the purported purpose of selling one pound of marijuana, and he appeared in video footage with another individual walking in the direction of 51 Salmon Street minutes before the shooting. Furthermore, Owens's testimony regarding the defendant's various incriminating statements made to her after the shooting—especially his statement that he had only meant to scare Joseph—strongly suggest that he was culpably involved in a coordinated attempt to commit robbery. Thus, we are satisfied that the trial justice articulated adequate grounds for denying the defendant's motion and that he neither overlooked nor misconceived material evidence, nor was otherwise clearly wrong, in making his decision.

## III

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court.  The record shall be returned to the Superior Court.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:** State v. Michael Tully, a.k.a Michael Vanover.

**CASE NO:** No. 2013-282-C.A.
(P1/12-3387AG)

**COURT:** Supreme Court

**DATE OPINION FILED:** March 9, 2015

**JUSTICES:** Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:** Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:** Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

For State: Virginia M. McGinn
Department of Attorney General

For Defendant: Lara E. Montecalvo
Office of the Public Defender