March 29, 2019

**Supreme Court**

No. 2017-254-C.A.
(P1/15-135A)

State                :

v.            :

Daniel Lastarza.        :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at (401) 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                    :

v.             :

Daniel Lastarza.      :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  The defendant, Daniel Lastarza (defendant), is before the Supreme Court on appeal from a judgment of conviction following a jury finding of guilty of second-degree murder, in violation of G.L. 1956 § 11-23-1.  The trial justice sentenced defendant to fifty years at the Adult Correctional Institutions, with forty years to serve and ten years suspended, with probation for the entirety of his sentence.  On appeal, the defendant advances two arguments.  First, he contends that the trial justice erred when she failed to instruct the jury on the lesser-included offense of voluntary manslaughter.  Next, the defendant assigns error to the trial justice's refusal to grant a mistrial based on alleged improper comments by the state's attorney during closing argument.  For the reasons set forth in this opinion, we affirm the judgment of conviction.

### Facts and Travel

On July 23, 2014, defendant and Christopher Tucker (Tucker), a neighborhood acquaintance of about two months, devised a plan whereby they would perpetrate a scam upon a scrap-metal salvage company known as "I Buy Junk Cars, LLC" (the company) by selling a broken down 2001 Ford Expedition—a vehicle that neither man owned—to the company.  This scheme was neither well-planned nor carefully executed, and had a catastrophic conclusion.  It

began when defendant arrived by bicycle at 149 Ridge Street, a multifamily building located in Providence, where Tucker resided. After he gave the Ford Expedition a cursory inspection in the backyard, defendant called the company and spoke with the owner, Jonathan Stack (Stack). The defendant described the make, model, and characteristics of the vehicle to Stack, and the two agreed that the company would purchase the Expedition and tow it away for $400. One of Stack's drivers was dispatched to retrieve the vehicle.

Approximately ten minutes later, Jerry Nassi, Jr. (Nassi), a tow-truck driver and employee of the company, received a text message from Stack with a phone number to call and schedule a time to buy and tow the vehicle. When Nassi contacted defendant, a meeting was arranged at the Ridge Street location to complete the transaction. However, Nassi's arrival was postponed by defendant when the true owner of the Ford Expedition, John Rocha (Rocha), a maintenance worker for 149 Ridge Street, showed up to work at the property.

At approximately 3 p.m., when the coast was clear, defendant notified Nassi that he could come and tow the vehicle. The defendant had falsely identified himself as "Peter" when he spoke to both Stack and Nassi because, according to his trial testimony, he was "scamming [Stack] out of a junk car"; he also told Nassi when he arrived that he owned the building and that the "owner" of the vehicle lived on the third floor. The defendant explained to Nassi that he was coordinating the sale because the "owner" was behind on rent. Nassi proceeded to the third floor of the building, where he met Kristen Litzenberger (Litzenberger), Tucker's wife, and the putative owner of the vehicle. Together, Nassi and Litzenberger filled out the bill of sale for the vehicle, and Nassi paid her $400 in cash. Nassi then went back downstairs, intending to tow the vehicle. It did not go well.

As Nassi backed his tow truck into the driveway, an irate Rocha suddenly reappeared and informed Nassi that the vehicle belonged to him, not Litzenberger, and that he was going to call

the police. As Rocha was calling the police, however, Tucker came out of the building and sought to turn the tables by accusing Nassi of trying to steal the vehicle and saying that Nassi "set his girl up" and had not given them the money. Nassi thereupon produced the signed bill of sale, and Tucker attempted to grab it out of his hands. Tucker then took a swing at Nassi, just grazing him; and, failing that, Tucker retreated inside the building. Unfortunately, the events of this failed caper spiraled out of control.

While Nassi and Rocha waited for the police, Nassi called Stack and explained the situation. When Stack arrived on scene, Tucker and defendant were nowhere in sight. This was the first in a series of disappearances and reappearances by this felonious duo. Approximately two hours later, the police arrived; took statements from Nassi, Stack, and Rocha; and arrested Litzenberger. As Nassi and Stack left 149 Ridge Street together at approximately 5:30 p.m., Stack spotted Tucker, who he apparently recognized from the description that Nassi had given to the police, standing on Atwells Avenue; Nassi pulled the truck over, just past The $3 Bar, a drinking establishment located on Atwells Avenue (the bar). Stack jumped out of the truck and ran to confront Tucker. The confrontation moved inside the bar, with Tucker and Stack arguing; Stack threatened to call the police and have Tucker arrested. As they continued to argue, Nassi appeared and the men moved deeper into the bar; eventually, the trio left through the back door. In the rear parking lot of the bar, the dispute became violent.

Stack and Tucker began pushing and shoving each other when, suddenly, Tucker grabbed Stack in a headlock and flipped him over, onto the ground. Tucker began to choke Stack by pressing his forearm across Stack's throat. Up until this point, Nassi was a bystander until he heard Stack say, "he's biting me, he's choking [me], get him the F off of me." When Nassi's efforts to pull Tucker away from Stack failed, he began punching Tucker in order to separate him from Stack.

- 3 -

Unbeknownst to the three men, defendant was lurking behind a fence, watching as the physical altercation unfolded. According to defendant's trial testimony, in an attempt to defend Tucker, who was being beaten by Nassi, defendant grabbed a "charred wooden" two-by-four[1] from an outdoor fireplace and ran toward the trio. The defendant struck Nassi with the board, and Nassi retreated a short distance away. As Stack lay on the ground, defendant delivered two fatal blows to Stack's head. Nassi returned to Stack's side; Nassi testified that Stack "was bleeding from his mouth, his head was crushed * * * there was just a lot of blood." Nassi rolled Stack onto his side to keep him from choking while he waited for an ambulance to arrive. Stack succumbed to his injuries on July 26, 2014.

While Nassi remained with Stack, defendant and Tucker ran towards Kenyon Street, about two blocks away from the scene. At that point, the events took another bizarre turn. The defendant proceeded to call the police and reported that "Tucker had been beaten by two men * * * with sticks[.]" He then returned to the area surrounding the bar, where Providence police officers had begun an investigation. In an apparent effort to deflect his guilt, defendant interjected himself into the police investigation. As Nassi and a Providence police detective were talking, defendant approached the detective and pointed to Nassi, identifying him as the person who "tried to * * * kill the guy[.]" Nassi was placed in the back of a police cruiser and, according to Nassi, as defendant walked away, "he looked back at [Nassi] and he smiled and, like, waved, like, very—like he was slick. He got away with something."

The defendant next approached Detective James Clift, a police detective assigned to the Bureau of Criminal Identification, and informed the detective that he had witnessed the assault. Detective Clift asked defendant to walk with him back to the scene, where he asked Detective

---

[1] The board itself was two inches by two-and-three-quarter inches wide, just over forty-three inches long, and weighed approximately three pounds.

Koren Pacheco Garcia to speak with defendant and "find out exactly what he had seen during the altercation." As Det. Clift continued his investigation, the owner of a neighboring restaurant approached him and told him that there was a man sitting out front eating Chinese food who, according to his workers, was involved in the altercation. Detective Clift and another officer immediately proceeded to the front of the restaurant and saw that it was defendant who was sitting in the doorway, eating Chinese food. Detective Clift approached defendant and asked if he had given a statement yet. The defendant replied that he had the detective's phone number and was going to call her later to give his statement.

Detective Clift conferred with another officer and went back to speak to defendant, who had fled the scene yet again. A search ensued, and defendant was spotted on his bicycle, pedaling away for the last time. Detective Clift then learned that defendant had given a false name during his interaction with Det. Pacheco Garcia, and he immediately placed a radio alert to locate defendant in the area.

The defendant went to 9 Lyon Court in Providence, the home of his girlfriend, Joanne Kissinger (Kissinger). Kissinger testified that, as they sat together on the patio, defendant "appeared to be very distraught" while he continued to eat his Chinese food. She explained that tears were welling up in his eyes as he started telling Kissinger about the events leading up to the fatal encounter; she testified, however, that defendant told her that he had told the police "everything that happened" and gave them his contact information. As the two were speaking, defendant was also trying to call his son and, after several failed attempts, texted his son saying, "Please call me. I'm going to jail for putting Johnny Stack in the hospital." Within minutes, the police arrived and questioned defendant about his having given them a different name. The defendant stated that he believed there was a warrant for his arrest. He was taken into custody.

Detective Clift and his intrepid team were able to retrieve security tapes from several locations that depicted many of the details that had been recounted to them by the witnesses they had interviewed, including the actual assault. On January 16, 2015, a grand jury returned an indictment charging defendant with one count of murder, in violation of § 11-23-1, and one count of assault with a dangerous weapon, "to wit, a wooden 2 x 4 framing stud," in violation of G.L. 1956 § 11-5-2, for the alleged assault on Nassi. Trial commenced on November 29, 2016, and on December 8, 2016, the jury returned a verdict of guilty as to second-degree murder on count one. The defendant was acquitted of assault with a dangerous weapon. The defendant's motion for a new trial was denied, and a judgment of conviction entered on March 24, 2017. The defendant timely appealed.

## Analysis

Before this Court, defendant argues that the trial justice erred when she failed to instruct the jury on voluntary manslaughter and instead gave an involuntary-manslaughter instruction, which involved factual prerequisites that did not exist in this case. The defendant also argues that the trial justice erred in refusing to declare a mistrial based on what he characterizes as the state's "wholly improper" statements made during closing argument and, further, that the cautionary instructions given by the trial justice failed to dispel the prejudicial effect of the state's summation.

## The Jury Instructions

### Standard of Review

This Court reviews issues pertaining to jury instructions on a *de novo* basis. *See State v. Vargas*, 991 A.2d 1056, 1060 (R.I. 2010). We "examine[] 'the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them, and review[] the challenged portions in the context in which they were rendered.'" *State v.*

- 6 -

*Carpio*, 43 A.3d 1, 10 (R.I. 2012) (brackets and deletions omitted) (quoting *State v. Cardona*, 969 A.2d 667, 674 (R.I. 2009)). "[A]n erroneous charge [to the jury] warrants reversal only if it can be shown that the jury could have been misled to the resultant prejudice of the complaining party." *Vargas*, 991 A.2d at 1063 (quoting *Maglioli v. J.P. Noonan Transportation, Inc.*, 869 A.2d 71, 75 (R.I. 2005)).

**Discussion**

The defendant first assigns error to the failure of the trial justice to instruct the jury on the lesser-included offense of voluntary manslaughter because, defendant posits, the instruction on involuntary manslaughter was not supported by the evidence in this case. However, defendant concedes that he did not object to the trial justice's instructions on second-degree murder or involuntary manslaughter. Despite an opportunity to review the jury instructions before the charge and an opportunity to be heard at sidebar, defendant failed to articulate an objection at trial, as required by Rule 30 of the Superior Court Rules of Criminal Procedure.[2] *See State v. Marrapese*, 116 R.I. 1, 11, 351 A.2d 95, 100 (1976) (explaining that failure of trial counsel to articulate their objections at the time instructions were given to the jury as required by Rule 30 precluded "appellate counsel from attempting to launch a belated challenge to the sufficiency of the charge").

Clearly, defendant's failure to object to the jury instructions is fatal to his appellate contentions.[3] A party must proffer a specific objection at trial so that the trial justice is alerted to

---

[2] Rule 30 of the Superior Court Rules of Criminal Procedure provides in part: "No party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection."

[3] In fact, not only did defendant fail to object to the involuntary manslaughter instruction, defendant argued involuntary manslaughter (an unintentional killing) and not voluntary manslaughter (an intentional killing) in his closing argument to the jury:

the allegation of error and thus has an opportunity to rule on it. *State v. Pona*, 66 A.3d 454, 468 (R.I. 2013). Accordingly, counsel's failure to make a specific objection—or any objection—will trigger this Court's longstanding raise-or-waive rule. *See State v. Hunt*, 137 A.3d 689, 693 (R.I. 2016). Because defendant's contention was not properly preserved for appellate review and there is no issue of constitutional dimension presented, defendant has waived the issue on appeal. *See State v. Davis*, 877 A.2d 642, 648 (R.I. 2005) ("The failure to contemporaneously object to the trial justice's instructions results in a waiver of any claim of error on appeal, unless, in the rare instance, 'the alleged error rises to substantial constitutional dimensions.'") (quoting *Jefferson v. State*, 472 A.2d 1200, 1203-04 (R.I. 1984)).

## Motion for a Mistrial

## Standard of Review

"When ruling on a motion to pass, the trial justice must assess the prejudicial impact of the statement in question on the jury and 'determine whether the evidence was of such a nature as to cause the jurors to become so inflamed that their attention was distracted from the issues submitted to them.'" *State v. Cipriano*, 21 A.3d 408, 428 (R.I. 2011) (quoting *State v. Brown*, 619 A.2d 828, 831 (R.I. 1993)). "The trial justice makes this determination by examining the witness's statement or remark in its factual context." *State v. Werner*, 830 A.2d 1107, 1113 (R.I. 2003). "Moreover, 'we previously have held that even prejudicial remarks do not necessarily require the granting of a motion to pass.'" *Roma v. Moreira*, 126 A.3d 447, 449 (R.I. 2015)

---

"The Judge will also instruct you as to manslaughter. She'll let you know that it's *an unintentional killing* without malice or premeditation. Again, if you find that * * * Mr. Lastarza acted in defense of Mr. Tucker, you don't get here. Where there's an unintentional killing, it doesn't matter. If the State hasn't proven to you beyond a reasonable doubt that what he did was not defense of a third person, you must return a verdict of not guilty." (Emphasis added.)

- 8 -

(brackets omitted) (quoting *State v. Alston*, 47 A.3d 234, 250-51 (R.I. 2012)). "It is well settled that 'a trial justice's decision on a motion to pass the case is addressed to the sound discretion of the trial justice, and this Court will not disturb the ruling on such a motion absent an abuse of discretion.'" *State v. Rosado*, 139 A.3d 419, 423 (R.I. 2016) (footnote omitted) (quoting *State v. Tully*, 110 A.3d 1181, 1190-91 (R.I. 2015)). "We give great deference to the trial justice in this regard because he or she 'has a front-row seat at the trial and is in the best position to determine whether a defendant has been unfairly prejudiced.'" *Id.* (quoting *Tully*, 110 A.3d at 1191).

**Discussion**

The defendant next assigns error to the refusal of the trial justice to grant a mistrial based on the state's closing argument and the prosecutor's use of what defendant characterizes as "damning and unfair contentions about [defendant's] propensity to commit crime." The defendant also argues that the trial justice's cautionary instruction was insufficient to dispel the prejudice resulting from the state's "name-calling" of defendant.

During the state's closing argument, the prosecutor made several statements relating to defendant's criminal history and labeled defendant a "thief," a "career thief," a "scam artist," and a "con artist." The prosecutor also highlighted the lies defendant told to Nassi, Stack, and law enforcement surrounding the scam, defendant's actual role in the events behind the bar, and his subsequent shenanigans during the police investigation. In this case, contrary to defendant's contentions, the prosecutor's statements during closing argument were based in large part upon the evidence and testimony adduced at trial. For example, defendant took the stand and testified that he was, in fact, "scamming [Stack] for the car"; that it was not his "first time" junking a car that did not belong to him (conduct also known as larceny); and that it was "fair to say [he] lied to the police" several times during the investigation.

Also bearing on his credibility, defendant acknowledged, before the jury, a lengthy criminal history that included eight stolen-car convictions, five larceny convictions, two breaking-and-entering convictions, fraudulent use of a credit card, eluding police, and obstruction of justice. It is clear from the record that the jury was confronted with the sworn testimony of an admitted liar and a thief who tried to convince the jury that he acted in defense of Tucker, and that he therefore should be absolved of any criminal responsibility. It was the state's burden in this case to disprove beyond a reasonable doubt that defendant acted in self-defense. In the context of the record of this case, we find nothing inflammatory or overtly prejudicial in these accurate statements. A criminal defendant is not entitled to a sanitized version of the facts or to be shielded from his own testimony.

On several occasions, this Court has held that "[a] prosecutor is given considerable latitude in closing argument, as long as the statements pertain only to the evidence presented and represent reasonable inferences from the record." *State v. Boillard*, 789 A.2d 881, 885 (R.I. 2002). "[W]hile there is no formula in law which precisely delineates the proper bounds of a prosecutor's argument, prejudice obviously inheres if the remarks are totally extraneous to the issues in the case and tend to inflame and arouse the passions of the jury." *Id.* (deletion omitted) (quoting *State v. Mancini*, 108 R.I. 261, 273-74, 274 A.2d 742, 748 (1971)). "The probable effect of the prosecutorial statements on the outcome of the case must be evaluated by examining the remarks in the context in which they were made." *Id.*

When defendant elected to testify on his own behalf at trial, he placed his credibility in issue; he then volunteered information about his past crimes and the scam that ended with Stack's murder. It is our opinion that the prosecutor's statement did not exceed the "considerable latitude" he was allowed as it "pertain[ed] only to the evidence presented." *State v. Horton*, 871 A.2d 959, 965 (R.I. 2005) (quoting *Boillard*, 789 A.2d at 885). We note that,

- 10 -

"while incidents of prosecutorial name-calling during closing arguments are inappropriate and unacceptable," *id.*, the comments made by the prosecutor in this case did not cross that line. Nothing the prosecutor said was "totally extraneous to the issues in the case[,]" *Boillard*, 789 A.2d at 885, and, because the prosecutor's remarks specifically addressed defendant's performance on the witness stand, we are satisfied that the trial justice did not err in denying the motion for a mistrial in relation to the prosecutor's closing remarks.

Moreover, defendant's argument concerning the insufficiency of the cautionary instructions without any evidence "that the jury was not capable of complying with the trial justice[']s cautionary instruction" is without merit. *See State v. Disla*, 874 A.2d 190, 198 (R.I. 2005) (quoting *State v. Powers*, 566 A.2d 1298, 1304 (R.I. 1989)). After the state's closing argument and defendant's motion for a mistrial, the trial justice instructed the jury as follows:

> "As jurors, you are concerned with facts determined from testimony and other evidence. You are the judges of a witness'[s] credibility. You determine what amount of weight should be given to each witness'[s] testimony. It is the duty of the [c]ourt to instruct you on the law of the case. The law is to be applied by me to the facts in the case as you determine those facts to be. To the extent the attorneys here have in any way offered their personal opinion of what the facts in this case are, or their opinion on the weight of evidence, such suggestions are of no moment. It is entirely up to you to determine the facts and the weight to be given to the testimony and evidence."

In spite of the defendant's contention that the cautionary instructions "could not dispel the prejudicial effect of the state's summation[,]" we perceive nothing in the record that indicates that any taint that might have existed was not cured by the trial justice's curative instruction. *See State v. McManus*, 941 A.2d 222, 234 (R.I. 2008) (explaining that nothing before the Court would lead to a finding that the jury could not decide the case "based on a dispassionate evaluation of the evidence") (quoting *State v. Lynch*, 854 A.2d 1022, 1034 (R.I. 2004)). In fact, because the defendant was acquitted of one of the two counts of the indictment, for the alleged

- 11 -

assault on Nassi, we are convinced that the jury decided this case based upon the evidence adduced at trial and was not prejudiced by the prosecutor's closing argument.  Our review of the record fails to reveal that the jury was unable to comply with the trial justice's cautionary instruction, and we "must assume that the jury did disregard the witness comments as it was instructed to do."  *Disla*, 874 A.2d at 198 (quoting *Powers*, 566 A.2d at 1304).  We are therefore satisfied that, in the circumstances of this case, the cautionary instruction cured the prejudice created by the prosecutor's comments labeling defendant as a "scam artist[,]" "liar[,]" and a "thief."

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment of conviction. The record may be remanded to the Superior Court.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Daniel Lastarza. |
| **Case Number** | No. 2017-254-C.A. (P1/15-135A) |
| **Date Opinion Filed** | March 29, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Kristin E. Rodgers |
| **Attorney(s) on Appeal** | For State: Virginia M. McGinn Department of the Attorney General |
| | For Defendant: Lara E. Montecalvo Office of the Public Defender |